142 N.J. Super. 136 (1976)
361 A.2d 30
IN RE THE MATTER OF PUBLIC HEARINGS ON THE AMENDED DETERMINATION OF THE COMMUTER OPERATING AGENCY FOR FISCAL YEAR 1975-1976.
Superior Court of New Jersey, Appellate Division.
Argued January 26, 1976.
Decided May 17, 1976.
*141 Before Judges FRITZ, SEIDMAN and MILMED.
Mr. Harold J. Ruvoldt, Jr., County Counsel, argued the cause for appellant County of Hudson.
*142 Mr. Glenn T. Leonard, Assistant County Counsel, argued the cause for appellant County of Bergen (Mr. Vincent R. Rigolosi, County Counsel, attorney).
Mr. John L. McGoldrick argued the cause for intervenors-appellants The Princeton Intervenors (Messrs. McCarter & English, attorneys).
Mr. William F. Morley appeared for intervenor St. Peters Preparatory School (Messrs. Degnan & Degnan, attorneys).
Appellant Monmouth County Board of Chosen Freeholders did not file a brief.
Mr. Kenneth S. Levy, Deputy Attorney General, argued the cause for respondent Commuter Operating Agency (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel; Mr. Richard A. Herman and Mr. Richard S. Goldman, Deputy Attorneys General, on the brief).
The opinion of the court was delivered by SEIDMAN, J.A.D.
These consolidated appeals challenge the action taken by the Commuter Operating Agency (COA) of the New Jersey Department of Transportation on November 25, 1975, authorizing its chairman to enter into new financial assistance contracts with certain rail and motor bus carriers subsidized by it, for periods of up to three months commencing December 1, 1975, which contracts would reflect fare increases and service adjustments set forth in COA's amended determination for fiscal year 1975-1976, as revised.
Appellants County of Hudson, County of Bergen and a group of citizens designated as The Princeton Intervenors (appellant Monmouth County Board of Freeholders did not file a brief) contend, essentially, that the amended determination is invalid in that (1) the declared effective date *143 of December 1 was contrary to N.J.S.A. 27:1A-16(f); (2) to the extent that it dealt with bus services, the action was now authorized by N.J.S.A. 27:1A-17; (3) COA arbitrarily promulgated uniform and across-the-board increases affecting all rail passenger lines in question; (4) COA failed to comply with the Administrative Procedure Act; (5) the action of COA was contrary to existing case law on the subject of rate hikes and fare increases; (6) the action taken constituted a denial of due process, in violation of both the State and Federal Constitutions; (7) the Equal Protection Clauses of both Constitutions were violated, and (8) the elimination of certain bus routes and the raising of fares on others denied commuters "their constitutional right to earn a livelihood." The Princeton Intervenors assert, additionally, that the COA should have held "adjudicative-type" hearings prior to its action increasing railroad fares, and that its failure to do so was a denial of due process of law.
Our thorough examination of the voluminous record and of the arguments presented satisfies us that, except for the first contention, with which we shall deal later, none of the others has merit.
The COA was established as a board within the Department of Transportation by the Transportation Act of 1966 (L. 1966, c. 301), as amended. N.J.S.A. 27:1A-15 et seq. It consists of four members: the Commissioner of Transportation, the Assistant Commissioner for Public Transportation, the State Treasurer, and the President of the Board of Public Utility Commissioners, or their respective designees.
The agency is charged with the duty annually to
* * * investigate and determine the financial results to each rail carrier from providing passenger service during the previous calendar year and determine what action is required for each carrier to offset all or part of any loss shown. Such determination may include but shall not be limited to (a) changes in service, fares, operating procedures and routings (b) improvements to capital facilities and (c) compensation by the State for service to be rendered under a contract. *144 The determination shall list the passenger service to be operated by a carrier under a contract and shall specify the fares to be collected for such passenger service; it shall also contain a list of projects to carry out the objectives of this act for which the commissioner recommends the use of public funds. Prior to making any such determination the agency may hold public hearings where it shall make known its proposed action to interested parties and the general public and receive from them any facts, material or recommendations that would be of assistance under the circumstances. All determinations shall be made public and filed with the Secretary of State not later than June 15 in each year. Amendments to any determination may be made at any time and filed with the original determination. [N.J.S.A. 27:1A-17]
Contracts for payments for service rendered may be entered into with any rail carrier, and shall provide for acceptance by such carrier of all or any part of the agency's determination. Prior to entering into any such contract the agency is required to hold public hearings "where it shall make known the terms and conditions of the proposed contract to interested parties and the general public." N.J.S.A. 27:1A-18. Each contract must describe the passenger service which the carrier is required to operate, "including time-tables, train consists and fair tariffs applicable to the service and any other provisions that the agency may deem reasonable." Id.
A separate section of the statute (N.J.S.A. 27:1A-19) empowers the COA to enter into contracts with motor bus carriers
* * * to operate passenger service which the agency shall determine (a) to be necessary to provide or encourage adequate commuter or intercity bus service and (b) would not otherwise be provided or made available without State assistance. Payment by the agency for such passenger service shall be based on the actual cost of such service to the motor bus carrier plus a 6% return on investment.
The agency may also enter into contracts with any motor bus carrier pursuant to which the agency may acquire, purchase or rehabilitate motor buses and capital equipment and facilities for lease to such carrier to be operated in or in connection with specified passenger service and pursuant to which the agency may acquire, purchase or rehabilitate any other real or personal property for *145 lease to such carrier to be utilized in specified passenger service or to permit related capital improvements. For the purposes of this section, the term motor bus carrier shall include any individual, co-partnership, association, corporation, joint stock company, receiver, or trustee which controls any motor bus carrier.
Among other things, each contract, when entered into, obligates the carrier
(a) To operate passenger service on its lines or over tracks of other railroads in accordance with said contract, and to collect fares from persons (other than those employees of railroads or other persons allowed free passage or reduced fares in such passenger service under statutes heretofore enacted or under agreements heretofore made and now in effect) at the rates set forth in the fare tariffs included in such contract;
(b) To secure, keep in effect and abide by all approvals, orders or other proceedings of any State or Federal agency or court with respect to the contracted service;
(c) During the term of the contract and such further period as the contract may provide, unless otherwise approved in writing by the agency, not to initiate, take or prosecute and to actively resist, any proceedings before any State or Federal agency or court for any order, approval, judgment, decree or other action impairing or limiting the rights, powers and capacity of the carrier to operate the contracted service and carry out and perform its obligations under said contract with respect to the contracted service;
(d) To maintain and operate passenger service required by virtue of the contract, equipment and all facilities incidental thereto in a safe, sanitary and proper manner and condition with a minimum of delays or cancellations and with maintenance of arrival and departure times for all stations and station stops; and
(e) To take all necessary action to initiate, expedite and complete within the stated time the improvements to capital facilities required by virtue of the contract. [N.J.S.A. 27:1A-20]
On July 7, 1975 the COA approved its "Determination for Fiscal year 1975-1976, Made Pursuant to Chapter 301, L. 1966 of Financial Results to Railroads from Providing Passenger Service During Calendar Year 1974 and Recommendations to Offset Losses Shown." Although not required by the statute, determinations with respect to the bus program were also included, apparently because the amount allocated in the state budget was for the funding of both programs. The original determination was based upon a budget of $19 million, an amount insufficient to qualify the *146 COA for an additional $35 million in federal funds. The budgeted amount had been reduced, because of the State's fiscal crisis, from an original request by the Governor for $67 million. Requests for assistance totalled about $107.5 million.
An advisory hearing was held on the determination. However, because of financial considerations, contracts were not offered to carriers at that time; instead, several short-term extensions of existing rail and bus contracts were authorized in anticipation of further funding by the Legislature.
In August 1975 the Legislature appropriated an additional $65 million with which to contract for rail and bus passenger service. Despite the increase in available funds, including those from federal sources, there was still a budget gap of approximately $9 million to be closed. This resulted in the amended determination, approved August 12, 1975, and revised on August 19 and 26. With respect to railroads, an increased fare structure was established, some schedule adjustments were made, and the closing of a number of stations was proposed. Subsidy contracts were offered to the railroads concerned.
As for the bus carriers, a plan was formulated for fare increases and service adjustments, to include both discontinuances and reductions in service, in order partially to offset losses.
Commencing August 26, 1975, 23 public hearings were held throughout the State, including Jersey City, Newark, and Hackensack, to make known the terms and conditions of the proposed rail service agreements. Separate hearings were held for proposed bus service contracts. Thereafter, on November 25, 1975, at a meeting of the COA, the resolution mentioned above was adopted. These appeals followed.

I

Standing of appellants to secure review of the actions of COA.
Respondent seeks to bar these appeals by challenging the standing of appellants to secure judicial review of final *147 COA action here. The argument advanced with respect to the appellant counties is that the requested review is of the same nature and scope as in Bergen Cty. v. Port of New York Auth., 32 N.J. 303 (1960), in that the counties seek to have COA's actions declared to be beyond its powers. The Princeton Intervenors is said to be "merely an interloper and stranger," without standing to challenge the sufficiency of the hearings held in Bergen and Hudson Counties. A similar objection is made to the position of Monmouth County. As for St. Peters Preparatory School, whose role on this appeal has been a passive one, COA asserts that the only harm alleged "is a vague reference to the inconvenience to a handful of students at that institution."
We are not convinced that the counties lack standing. Apart from the fact that the cited case is inapposite, it is to be noted that whenever public hearings are held under the statute here involved, the rules of the Department of Transportation require that notice thereof be given to, among others, "interested municipal and county officials." See N.J.A.C. 16:50-1.3, 2.3, and 3.3. Moreover, according to the record in our possession, representatives of the Counties of Hudson and Bergen appeared at hearings respectively held, in Jersey City and Hackensack, and their comments were received without objection. In the circumstances, we choose not to explore further the matter of the standing of the counties involved. We shall consider the issues presented by them on their merits.
As it relates to the other appellants, COA's argument respecting their standing is not entirely without merit. We agree, for example, that the Princeton Intervenors and the County of Monmouth were not involved in the subject matter of the hearings conducted in Bergen and Hudson Counties; consequently, their right to attack the proceedings there is at best doubtful. The COA correctly notes that we have not been provided with a transcript of the hearings on any contract affecting these appellants. Nevertheless, some of the issues presented on this appeal are intertwined and sufficiently *148 broad in scope, so that we need not be unduly concerned with the possible lack of standing of any appellant on a specific issue.

II

Statutory authority for the COA Determination.
Hudson and Bergen Counties question the inclusion in the amended determination of matters pertaining to bus carriers, contending that this exceeds the authority given the agency by N.J.S.A. 27:1A-17. They submit, furthermore, that N.J.S.A. 27:1A-24 controls the procedure to be followed by the COA in curtailing or abandoning existing bus service and in charging applicable fares, and that the provisions of this section were not complied with in the formulation of the amended determination. They point to the language of § 24 which, they say, obligates the COA to hold public hearings before any changes in passenger service are effected or fares increased. Finally, counsel for Hudson County argues that the COA violated the provisions of N.J.S.A. 27:1A-24 by "summarily revers[ing] and/or disregarding the conclusion of Hearing Examiner Nicholas W. Mattia, Jr. in implementing its Amended Determination for Fiscal year 1975-76 as to Hudson County."
While it is true that the obligation of the COA is to prepare, publish and file with the Secretary of State its determination of the financial results to each rail carrier from providing passenger service during the previous year and to determine what action is required for each carrier to offset all or any part of any loss shown (N.J.S.A. 27:1A-17), and that no reference is made therein to a similar determination for bus carriers, we fail to understand why appellants should complain of the inclusion in the determination of studies and conclusions relating to bus carriers. The agency, under N.J.S.A. 27:1A-19, is empowered to contract with such carriers to operate passenger service which the agency shall determine "(a) to be necessary to provide or *149 encourage adequate commuter or intercity bus service and (b) would not otherwise be provided or made available without State assistance."
Since but one amount was budgeted for both rail and bus carriers, we see nothing wrong in COA's expanding the determination, even though not required by statute, to include its plans for bus carriers and to specify the allocation of available funds to both types of carriers. It would be absurd to hold that such inclusion, the worthwhile purpose of which was more fully to inform the public and all other interested parties, invalidated the determination. There is no statutory or other prohibition aganst ths exercse of administrative concern.
Both counties further contend that the determination is invalid because of COA's failure to comply with N.J.S.A. 27:1A-24, which, they assert, contains the exclusive method for curtailing or abandoning passenger services or changing applicable fares. They are in error. Section 24 applies only to the right of a carrier to petition the agency or of the agency to move on its own motion for changes in service and fares during the term of an existing contract with the carrier. It is inapplicable here.

III

The nature and scope of the required public hearing.
Bergen County argues that the hearings in Hackensack did not comply "with the sections [N.J.A.C. 16:50-3.1 et seq.] setting forth the ground rules for proper conduct of a `mandatory formal hearing' as required by N.J.S.A. 27:1A-24." A substantially similar argument is offered by Hudson County with respect to the Jersey City hearings. However, as we pointed out earlier, this section pertains to the requisite hearing on a petition by a carrier for contract changes during the term of its contract. Such a petition is not involved here.
*150 A broader position is taken by The Princeton Intervenors. It contends that a "trial-type" hearing was required under N.J.S.A. 27:1A-18. The assertion is made that without such hearing there was no way "for interested parties to test the railroads' submissions as to costs, revenues, etc.," "in order either to reduce the amount of state subsidy or to make that subsidy go further in terms of service," and to be able to demonstrate, to that end, "that the railroads' submission in support of subsidy are faulty and that the state should thereby be able to pay less to the railroads in such subsidies."
These appellants misconstrue the nature and scope of the hearings here involved.
Three types of hearings are set forth in N.J.S.A. 27:1A-15 et seq., the procedural details of which are contained in N.J.A.C. 16:50-1.1 through 1.5, 16:50-2.1 through 2.5, and 16:50-3.1 through 3.4.
Under N.J.S.A. 27:1A-17, prior to the filing of the agency's annual determination, a public hearing may be held to receive from interested parties and the general public "any facts, material or recommendations that would be of assistance under the circumstances." This is designated in N.J.A.C. 16:50-1.1 as the "Optional Advisory Hearing." It appears that such hearing was held on July 14, 1975 and that the hearing examiner's report and recommendations were adopted by the COA on July 15, The propriety of that action is not before us on this appeal.
Another type of hearing is the "Mandatory Advisory Hearing," for which provision is made in N.J.A.C. 16:50-2.1. Before entering into any contract with a rail carrier in implementation of the annual determination, the COA is required by N.J.S.A. 27:1A-18 to hold such hearing to make known the terms and conditions of the proposed contract to interested parties and the general public.
Finally, there is the "Mandatory Formal Hearing" (N.J.A.C. 16:50-3.1 through 3.4), held where a rail or bus carrier, *151 during the term of its contract, petitions the agency to change the contract by decreasing passenger service or increasing fares. N.J.S.A. 27:18-24.
Appellants' concept seems to be that the agency was required to hold a full-blown hearing and then adjudicate the matter before it. They are mistaken.
The Legislature in its discretion may provide for particular types of administrative hearings, in which case the prescribed procedure must be followed. Wilson v. Long Branch, 27 N.J. 360, 386 (1958). But merely because the duty is imposed on the agency to receive and consider evidence in connection with a hearing provided for in a statute, it does not per se signify that the hearing is to be of the trial type. Id. at 387. See also, Norwegian Nitrogen Prod. Co. v. United States, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933). The elements attendant upon judicial proceedings, including "findings of fact, with the necessary due process elements of examination and cross-examination, are required only when the administrative process is adjudicatory in nature or when the Legislature requires that such findings be made before the agency can act." Consolidation Coal Co. v. Kandle, 105 N.J. Super. 104, 119 (App. Div. 1969), aff'd 54 N.J. 11 (1969). An adjudication is defined in the Rules of Administration Procedure (N.J.A.C. 15:15-10.1) to be "any and every final determination, decision or order made or rendered in any contested case" (Emphasis supplied). And a contested case means
* * * a proceeding, including any licensing proceeding, in which the legal rights, duties, obligations, privileges, benefits or other legal relations of specific parties are required by constitutional right or by statute to be determined by an agency by decisions, determinations, or orders, addressed to them or disposing of their interests, after opportunity for an agency hearing. [N.J.A.C. 15:15-10.1]
If the hearings held here were on a carrier's petition to decrease passenger service or increase fares (N.J.S.A. *152 27:1A-24), we have little doubt that the proceedings would constitute a "contested case" requiring administrative adjudication. In such case the proceedings would have to be conducted in the manner set forth in N.J.A.C. 16:50-3.4, and would be closer to the "trial-type," adversary hearing advocated by The Princeton Intervenors, with ultimate findings of fact and conclusions of law by the agency (see N.J.S.A. 52:14B-9 and 10; Rules of Administrative Procedure, N.J.A.C. 15:15-10.1 et seq.), and wherein every party would have the right to present his case "by oral or documentary evidence, to submit rebuttal evidence and to conduct such cross-examination as may be required for a full and true disclosure of the facts." N.J.A.C. 15:15-10.3(e). Cf., e.g., Brotherhood of R.R. Trainmen v. Palmer, 47 N.J. 482, 487 (1966); Susquehanna etc., Ass'n. v. Bd. of Pub. Util. Comm'r's., 55 N.J. Super. 377, 407 (App. Div. 1959).
We do not consider the proceedings here under review to be a contested case or one of an adversary nature. Notwithstanding Bergen County's argument to the contrary, the subject-matter was not within the purview of N.J.S.A. 27:1A-24. Nor did the proceedings involve "submissions by rail carriers" (a phrase employed by The Princeton Intervenors). The rail carrier hearings in which Bergen was interested dealt with the terms and conditions of a proposed contract for passenger service to be furnished by the Erie Lackawanna Railroad. The appeal of The Princeton Intervenor relates to a similar contract with the Penn Central Railroad. In each case the matter was within the ambit of N.J.S.A. 27:1A-18, and the hearings were "for the statutory purpose of making the provision of the proposed contract known to the public and receiving any information or suggestions from them." N.J.A.C. 16:50-2.1. This clearly contemplated a legislative, rather than a judicial-type hearing, and as long as the public was accorded the right to be heard, due process was not denied. Consolidation Coal Co. v. Kandle, supra, 105 N.J. Super. at 118.
*153 N.J.A.C. 16:50-2.4 prescribes how such hearing is to be conducted by the Commissioner of Transportation or his designated representative:
* * * The hearing officer will explain the purpose of the hearing, regulate the appearance of witnesses, conduct such questioning as he may feel is warranted and answer questions directed to him by those participating in the hearing. All testimony will be recorded * * * Witnesses will not be sworn, need not be represented by counsel, and may refuse to be questioned. Prepared testimony and exhibits will be accepted without judgment of relevancy.
At the conclusion of the hearing the hearing officer is required to report the results thereof with a recommendation as to their effect upon the proposed contract. N.J.A.C. 16:50-2.5.
Our examination of the transcript of the Erie Lackawanna proceedings in Hackensack satisfies us that the hearings were substantially in accordance with N.J.A.C. 16:50-2.4. Although we have not been furnished with the record of what transpired in Middlesex County, there is no reason to infer that the hearings there were conducted differently.
Counsel for Bergen County complains that a six-minute time limit was imposed on persons who wished to be heard; that no "meaningful cross-examination" was permitted; and that exhibits were not offered in advance, and financial data pertaining to the affected carriers was not furnished, offered or made available. As for the last point, we know of no provision by statute or rule that exhibits must be offered in advance. Further, the "financial data" referred to was contained in the determination for fiscal year 1975-76, a copy of which, it is to be noted, was available to anyone at the offices of the Department of Transportation either in Trenton or in Newark. Additionally, copies of both the original and the amended determination were received in evidence at the Hackensack hearings, and extra copies were offered to those in the audience who desired them. And, in addition, a detailed presentation was made orally by COA representatives.
*154 The assertion that those desiring to be heard were limited to a few minutes is not entirely accurate. While a limitation was placed upon their initial remarks, an opportunity was given for further comments after all the other speakers had been heard. Moreover, previously prepared statements and exhibits were permitted to be presented. The record reveals that anyone who wished to speak either pro or con was permitted a reasonable opportunity to do so. No one was denied the privilege of putting questions to the COA representative.
The Princeton Intervenors complain of a lack of opportunity for cross-examination at the September hearings on the Penn Central contract. Assuming that to be so (we note again the absence of a transcript), the right of the public to be heard in a matter of this kind does not include the right to cross-examine. See Consolidation Coal Co. v. Kandle, supra, 105 N.J. Super. at 118. Moreover, it does not appear that these appellants were even present or represented at those hearings.
In short, we are thoroughly convinced that the hearings on the proposed rail carrier contracts fully satisfied the requirements of N.J.A.C. 16:50-1.4, and that there is no due process deficiency.
We direct our attention next to the separate hearings in Hackensack and Jersey City relating to motor bus carriers. The absence of a statutory or rule basis for such hearings should be noted at the outset. They were not for the purpose of considering, prior to filing, the agency's annual determination of financial results to railroads, nor of making known to the public proposed contracts with rail carriers. Furthermore, the subject-matter was not a petition by a carrier to decrease services or increase fares during the term of its contract with the agency. The published notice of the hearings (we assume the use of the same format in all cases) stated that the COA had approved an amendment to its annual determination recommending that the new contract with the bus carrier or carriers concerned should include among *155 its terms that there would be indicated fare increases and that certain service schedules and routes would not receive financial assistance from the agency. The public was informed that the hearings would be held "as authorized by N.J.S.A. 27:1A-15 et seq. in connection with these proposals," that they would be conducted "in accordance with N.J.S.A. 52:14B-1 et seq. and the rules of the New Jersey Department of Transportation found in Chapter 50, Title 16 of the New Jersey Administrative Code," and that the public would have "full opportunity to express their views."
It seems evident, therefore, despite the fact that the hearings were not mandated either by statute or by rule, that their purpose, as in the case of rail carriers, was to make known to the public the terms of the proposed bus passenger service contracts. A perusal of the transcripts of the proceedings bears out that the hearings were conducted in essentially the same manner. The public was accorded the same reasonable opportunity to be heard on the proposed bus carrier contracts as on the proposed rail carrier contracts. They were not entitled to more. Consequently, the objections of Hudson County, similar to those of Bergen County, are equally without merit.

IV

Sundry objections by appellants.
We perceive no need to deal at length with the other arguments advanced by appellants. They include assertions that the COA arbitrarily promulgated uniform and across-the-board fare increases affecting all rail passenger lines, instead of acting on an individual basis; that it was improper to approve increased rates without the establishment of a rate base and a fair rate of return; and that the decrease in services and the increase in fares violated the due process and equal protection rights of the inhabitants of New Jersey to travel, to earn a livelihood and not *156 to be discriminated against because of wealth. All are devoid of merit.
First, the COA did not promulgate "uniform and across-the-board" increases in rail fares; rather, it established a uniform rate structure based upon a cent-per-mile factor. In any case, appellants merely argue, in substance, that the action was arbitrary in that the COA did not consider separately the financial circumstances of each rail carrier and determine the extent of the increase required for each.
It is well established that a presumption of reasonableness attaches to the action of an administrative agency, and the one who challenges the validity of that action has the burden of showing that it was arbitrary, unreasonable or capricious. Cf. Brotherhood of R.R. Trainmen v. C.R.R. of N.J., 47 N.J. 508, 517 (1966). Schwerman Trucking v. Dept. of Env. Protection, 125 N.J. Super. 14, 18 (App. Div. 1973); Consolidation Coal Co. v. Kandle, supra, 105 N.J. Super. at 114-115. Appellants have not made such a showing here. Beyond this, our careful study of the record satisfies us that there was an abundance of factual and statutory support for the action taken. We discern no sound reason to interfere with the agency's determination in this respect. Cf. United Transp. Union v. State of N.J., 112 N.J. Super. 290, 294 (App. Div. 1970), certif. den. 57 N.J. 597 (1971).
Next, it is contended that the establishment of rate increases did not conform to "the controlling law on rate hikes." The position seems to be that the COA was obligated to proceed in the same manner as would the Public Utility Commission in considering application by carriers for rate increases. The short answer is that the COA is governed by a different statute. The cases cited are inapposite.
Finally, with respect to the constitutional arguments raised by appellants, quite apart from their lack of substantive merit, we need merely note that one who would raise the constitutional rights of a class must be a member of that class. Cf. Bailey v. Patterson, 369 U.S. 31, 82 *157 S.Ct. 549, 7 L.Ed.2d 512 (1962); Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953); and see, Edelstein v. Ferrell, 120 N.J. Super. 583, 592 (Law Div. 1972).

V

Effective date of action taken by COA on November 25, 1975.
At an official COA meeting which took place on November 25, 1975 the agency decided to implement its subsidy program as of December 1, and, as we said earlier, adopted a resolution authorizing its chairman "to enter into appropriate agreements to provide rail and bus service for up to three months beginning December 1, 1975." Pursuant to N.J.S.A. 27:1A-16(f), a true copy of the minutes was delivered to the Governor and verbally "approved" by him on November 26.
Appellants contend that the earliest possible effective date of the action taken would have been December 12 and that the COA, by fixing an earlier date, "acted unlawfully and usurped the power of the Legislature," thus rendering its action void ab initio.
N.J.S.A. 27:1A-16(f) provides that:
(f) A true copy of the minutes of every meeting of the agency shall be delivered forthwith by and under the certification of the secretary thereof, to the Governor. No action taken at such meeting by the agency shall have force or effect until 10 days, exclusive of Saturdays, Sundays and legal holidays, after such copy of the minutes shall have been delivered. If, in said 10-day period, the Governor return such copy of the minutes with veto of any action taken by the agency or any member thereof at such meeting, such action shall be null and of no effect. [Emphasis supplied]
Not counting the intervening holiday (Thanksgiving Day), as well as November 27, and the weekend of November 29 and 30, the last day of ten-day period following delivery of the minutes to *158 the Governor would have been December 10. Counsel for the COA argues, however, that "a review of the legislative purpose behind section 16(f) supports the logical and reasonable conclusion that the Governor, when he deemed it necessary, could approve formally and make effective actions of the COA within the specified 10-day period." We disagree.
It is a fundamental tenet of statutory construction that in the absence of an explicit indication of a special meaning, the words of a statute are to be given their ordinary and well understood meaning. Fahey v. Jersey City, 52 N.J. 103, 107 (1968); Kingsley v. Hawthorne Fabrics, 41 N.J. 521, 526 (1964). Where the language of a statute is plain there is no need for interpretation. Lopez v. Santiago, 125 N.J. Super. 268, 270 (App. Div. 1973). A clear and unambiguous statute is not open to construction or interpretation. Watt v. Franklin Mayor and Council, 21 N.J. 274, 277 (1956).
"No action taken" at a meeting of the agency "shall have force and effect" until ten-days (excluding weekends and legal holidays) after a copy of the minutes shall have been delivered to the Governor. Although he may veto within the ten-day period any action taken, there is no requirement that he affirmatively approve the minutes, nor is there any suggestion that this time period might be foreshortened by executive approval. The words of the statute are so explicit that we should not indulge in a presumption that the Legislature intended something other than what it actually expressed in the statute. Bass v. Allen Home Improvement Co., 8 N.J. 219, 226 (1951).
If the Legislature had intended the COA action to become effective upon an expression of executive approval or disclaimer of an intent to veto, it would have said so, as it has done in the case of other statutes containing comparable provisions. For example, as originally enacted, the Port of New York Authority law contained provisions that the minutes of every meeting of the authority "shall be forthwith *159 transmitted * * * to the governor of this state," and that "no action taken at such meeting by any commissioner appointed from this state shall have force or effect for a period of ten days after the minutes shall have been so transmitted and delivered." N.J.S.A. 32:2-6. It was further specified that the Governor "shall, within ten days after the minutes shall have been so delivered, cause the same to be returned to the port authority either with or without his veto * * *." (emphasis supplied). N.J.S.A. 32:2-7. The statute was later amended (L. 1972, c. 20, § 1) by adding the following to § 6:
No action taken at such meeting by any commissioner appointed from this State shall have force or effect for a period of 10 days, Saturdays, Sundays and public holidays excepted, after the minutes shall have been so transmitted and delivered unless the Governor shall finally approve the minutes or any part thereof, reciting any such action, within said 10-day period. [Emphasis supplied]
Similarly, the New Jersey Turnpike Authority Law (N.J.S.A. 27:23-3(F)) required the delivery to the Governor of a copy of the minutes of the authority, and provided that "[n]o action taken at such meeting by the authority shall have force and effect until 10 days after such copy of the minutes shall have been so delivered." If, within the tenday period, "the Governor returns such copy of the minutes with veto of any action taken by the authority or any member thereof at such meeting, such action shall be null and of no effect." A 1973 amendment empowered the Governor to "approve all or part of the action taken at such meeting prior to said 10-day period." L. 1973, c. 38, § 1.
For other statutes declaring actions taken by an authority to become effective upon approval by the Governor within a specified period of time, see New Jersey Sports and Exposition Authority Law, N.J.S.A. 5:10-4(i); New Jersey Health-Care Facilities Financing Authority Law, N.J.S.A. 26:2I-4(i), L. 1972, c. 29, § 4; New Jersey Educational *160 Facilities Authority Law, N.J.S.A. 18A:72A-4; New Jersey Economic Development Authority Law, N.J.S.A. 34:1B-4, L. 1974, c. 80, § 4. But see New Jersey Highway Authority Law, N.J.S.A. 27:12B-4 (amended L. 1973, c. 370, § 1) which, like the one here involved, provides only for the Governor's veto within the stated ten-day period, and not for approval within that time.
We find unconvincing the agency's argument that there "exists no reasonable justification to assume that the Legislature intended to bestow upon the governor the power to approve authority action within the 10-day period for all authorities and agencies, other than the COA." We are not persuaded that the inclusion of specific language authorizing approval by the Governor of authority action within the ten-day period in other statutes "was intended simply to clarify the Legislature's existing interpretation of the law." This may have been so in the case of the New York Port Authority, where the directive was for the return of the minutes within the ten-day period either with or without a veto, but such could not have been so with respect to the Turnpike Authority or the Highway Authority.
It is noteworthy that when the Legislature amended paragraph (f) of N.J.S.A. 27:1A-16 in 1972, it could have inserted a provision similar to what it had incorporated earlier that year into § 6 of the Port Authority of New York Law. It did not do so. If there was an oversight, the remedy is with the Legislature. The Legislature is assumed to be thoroughly conversant with its own legislation. Brewer v. Porch, 53 N.J. 167, 174 (1969); cf. Matawan v. Monmouth Cty. Tax Bd., 51 N.J. 291, 299 (1968).
We therefore conclude that the action taken by the COA could not validly have become effective on December 1. See 2 Am. Jur.2d, Administrative Law, § 289 at 118 (1962); 1 Davis, Administrative Law Treatise, § 6.07 at 383-385 (1958); 1 Cooper, State Administration Law, c. VIII, Rule Making: Filing and Publication," at 214 (1965). This does not, however, vitiate ab initio the action taken, as appellants *161 contend. It simply means that the contracts could not legally take effect until December 11, 1975, at the earliest.
For the purposes of this appeal, the premature implementation of the COA resolution affects only increases in rail fares. There were no increases in bus fares during that period as the result of any COA contract. As for any decrease in rail or bus passenger services or facilities that may have been made, we know of no way to undo or restore them at this time.
It will be recalled that on November 28, 1975 a single judge of this court, acting on an application by the present appellants, or some of them, for emergent relief under R. 2:9-8, temporarily stayed the action of the COA increasing railroad fares as of December 1, until this court could act upon the matter of a further stay pending the appeal. The stay was temporarily vacated by a single justice of the Supreme Court, who ordered that "all riders are to be provided with receipts to enable them to recoup overcharges in the event appellants are successful on the merits of their appeal." The full Supreme Court confirmed the action taken by the single justice. And this court, with one judge dissenting, later denied the application for stay pending the appeal.
Since we have determined that the earliest effective date of the COA resolution was December 11, 1975, it necessarily follows that fare increases paid by riders from December 1 to that date will have to be refunded. The COA is accordingly directed immediately to notify the rail carriers concerned of their obligation to make such refund to any rider upon the presentation of a receipt (as ordered by the Supreme Court) evidencing the overcharge. The agency shall also cause public notice to be given advising members of the riding public of their right to obtain reimbursement of the overcharge upon the presentation of a receipt.
Except as modified with respect to the effective date thereof, we affirm the action of the Commuter Operating Agency of November 25, 1975, implementing its amended determination for the Fiscal year 1975-1976.