187 N.J. Super. 603 (1980)
455 A.2d 583
ANN KLEIN, COMMISSIONER OF THE DEPARTMENT OF HUMAN SERVICES, STATE OF NEW JERSEY; AND CLIFFORD A. GOLDMAN, STATE TREASURER, STATE OF NEW JERSEY, PLAINTIFFS,
v.
COUNTY OF HUDSON; BOARD OF CHOSEN FREEHOLDERS, COUNTY OF HUDSON, EDWARD F. CLARK, JR., HUDSON COUNTY EXECUTIVE; EUGENE F. BRUNNER, HUDSON COUNTY TREASURER, DEFENDANTS.
Superior Court of New Jersey, Law Division Hudson County.
Decided June 20, 1980.
*607 Joseph T. Maloney, Deputy Attorney General, for plaintiffs.
Jay M. Liebman, Assistant County Counsel, for defendants.
TARLETON, J.S.C.
Plaintiffs have moved for summary judgment and to dismiss defendants' counterclaim. In this action plaintiffs seek to recover damages for the cost of care and maintenance of indigent patients hospitalized at various state institutions. The amount in issue is $14,326,513.89, consisting of $13,975,364.03 for services rendered indigents up to December 31, 1979, prejudgment interest of $901,140.84 up to March 15, 1980, less a $549,990.98 credit due defendants because of legislation enacted March 14, 1980.
Plaintiffs' original complaint was filed on October 31, 1978 in the Superior Court, Mercer County. As originally structured, plaintiffs sought to recover damages from Mercer County, Hudson County and various county officials. On January 2, 1979 the claim against Hudson County, which sought damages of $247,447.21 under N.J.S.A. 30:4-68 for patients at Glen Gardner Center for Geriatrics, was severed and venue was transferred from Mercer to Hudson County. On January 4, 1980 an amended complaint was filed in which plaintiffs sought to recover damages of $13,248,980.20 plus interest for patients at 14 state institutions and in specialized residential services.
In their amended complaint plaintiffs Ann Klein, Commissioner of the Department of Human Services, State of New Jersey, and Clifford A. Goldman, State Treasurer, State of New Jersey, sue the County of Hudson, its Board of Chosen Freeholders, Edward F. Clarke, Jr., the Hudson County Executive, and Eugene F. Brenner, the Hudson County Treasurer, pursuant to *608 N.J.S.A. 30:4-68 and 30:4-78 to recover one-half the cost of the care and maintenance of indigent patients having legal settlement in Hudson County who are hospitalized in state institutions or specialized residential facilities.
The institutions or facilities and the charges for each up to December 31, 1979 are:

 Greystone Park Psychiatric Hospital $ 719,209.57
 Trenton Psychiatric Hospital 4,360,927.16
 Marlboro Psychiatric Hospital 384,153.29
 Ancora Psychiatric Hospital 34,177.36
 Arthur Brisbane Child Treatment Center 42,782.80
 Glen Gardner Center for Geriatrics 433,327.02
 Vineland State School 1,511,483.25
 North Jersey Training School 1,062,649.47
 Woodbine State School 588,176.13
 New Lisbon State School 849,585.76
 Johnstone Training and Research Center 138,416.45
 Woodbridge State School 1,565,502.69
 Hunterdon State School 732,282.98
 New Jersey Neuropsychiatric Institute 1,157,169.51
 Specialized Residential Services 395,520.59

For classification purposes, the following are psychiatric institutions:
Greystone Park Psychiatric Hospital
Trenton Psychiatric Hospital
Marlboro Psychiatric Hospital
Ancora Psychiatric Hospital
Arthur Brisbane Child Treatment Center
Glen Gardner Center for Geriatrics
The following are intermediate care facilities/mentally retarded (ICF/MR):
Vineland State School[*]
North Jersey Training School[*]
Woodbine State School
New Lisbon State School

*609 Woodbridge State School
Hunterdon State School
New Jersey Neuropsychiatric Institute[*]
and the following is a mentally retarded/not intermediate care facility:
Johnstone Training and Research Center.
Each month the State billed Hudson County by sending invoices to the County Adjuster naming the institution, name and serial number of each patient, the period of hospitalization and the daily rate charged. In November 1977 Hudson County stopped making payments for indigents transferred from Trenton Psychiatric Hospital to Glen Gardner; in March 1978 it stopped making payments for indigents at Trenton Psychiatric and Woodbridge State School; in April 1978 it stopped making payments for indigents at Greystone, Marlboro, Ancora, Arthur Brisbane, Vineland, North Jersey, Woodbine, New Lisbon, Johnstone, New Jersey Neuropsychiatric and for those indigents in special residential services, and in April 1979 it stopped making payments for indigents at Hunterdon.
The $13,975,364.03 amount sought by plaintiffs is a "net" amount which was adjusted to reflect, as credits to Hudson County, receipts by indigents of Social Security amounts, Blue Cross receipts, insurance payments and trust funds.
Summarized, this suit seeks to recover care and maintenance costs for indigents in Greystone, Marlboro and Ancora who are not receiving Medicaid funds; for indigents in Trenton, Arthur Brisbane and Glen Gardner; for indigents in intermediate care facilities/mentally retarded; for indigents in mentally retarded/not intermediate care facilities, and for indigents in special residential facilities.
Defendants answered and counterclaimed. In their answer defendants deny any liability for patients confined in Glen Gardner Center for Geriatrics; assert that the care and treatment of patients is inadequate; deny receiving the requisite three-day notice called for in N.J.S.A. 30:4-79, and contend that if any facility is ineligible for Medicare because of the State's *610 failure to operate it properly, no liability for any indigent patients housed in that facility may be visited upon the county.
The county's counterclaim seeks damages for payments made by the county for patients improperly admitted to Trenton Psychiatric Hospital and/or Glen Gardner Center for Geriatrics or for patients who were kept longer than necessary after determinations that they should have been discharged, or whose stays were prolonged by the inadequacy of care and treatment afforded them, or because the institution did not receive accreditation, increasing the County's financial burden.
Summarized, plaintiffs' position is: (a) Hudson County, as the county of legal settlement, is obliged by N.J.S.A. 30:4-68 to pay all care and maintenance costs for indigents in state hospitals; (b) Hudson County is obliged by N.J.S.A. 30:4-78 to pay one-half the maintenance costs of all indigents housed in state hospitals "for the mentally ill"; (c) accreditation of any state institution is not a condition precedent to the county's liability; (d) participation in the Medicaid program in no way affects the county's liability; (e) the county is liable for indigents hospitalized in Glen Gardner, and (f) inefficient operation of any state institution or improper patient commitment are not defenses to this action.
Defendants resist the motion on the following grounds: (1) no liability arises for indigents hospitalized in Glen Gardner because it is not an institution for the "mentally ill"; it is not a licensed facility and all of its patients are eligible for Medicaid which payments when received represent "payment in full"; (2) no liability may be imposed upon the County for patients housed in intermediate care facilities/mentally retarded (ICF/MR) because they are not hospitals for the "mentally ill" and all ICF/MR patients are eligible for Medicaid, which payments represent "payment in full"; (3) Hudson County is not liable for any patients eligible for Medicaid; (4) no liability may be imposed for patients at Johnstone since it lacks accreditation; (5) no liability may be imposed upon the county for patients *611 housed in any unlicensed state facilities, and (6) the county is entitled to credits of $732,703 by virtue of legislation enacted March 14, 1980, N.J.S.A. 30:4-68.1, rather than a credit of $549,990.98, as calculated by plaintiffs.
Plaintiffs' motion was originally scheduled for argument on March 7, 1980. The argument was adjourned once at defendants' request and once at plaintiffs' request. Up until the day of argument, May 2, 1980, no discovery was sought by either side. However, at oral argument defendants requested and were given leave to take depositions on an expedited basis. On May 21, 1980 depositions were taken of Dr. Michael Rotov, Director of the Division of Mental Health, and Thomas M. Russo, Director, Division of Medical Assistance and Health Services in the Department of Human Resources. Additional argument was presented on June 16, 1980.

I

LIABILITY UNDER TITLE 30
N.J.S.A. 30:4-68 provides:
In all cases where a patient is found to have a legal settlement in any county in this State, and he and his legally responsible relatives are unable to pay the cost of his hospitalization, then the cost of his care and maintenance shall be borne by such county from the beginning of this confinement, as provided by law, except that part which may be collected on account of his board, as provided in section 30:4-60 of this Title.
N.J.S.A. 30:4-49 defines "legal settlement" as:
... continuous residence in such county for a period of not less than five years immediately preceding the date of application for commitment, excluding the time, if any, spent by the patient in any charitable, or correctional institution or public hospital.
Where an indigent patient has no legal settlement in any New Jersey county, the cost of his hospitalization is borne by the State. N.J.S.A. 30:4-69.
N.J.S.A. 30:4-78 authorizes the State House Commission to fix per capita cost rate for patients in state institutions. It also provides:
The rate to be paid by counties to the State in behalf of the maintenance of county patients in State hospitals for the mentally ill shall be 1/2 of the actual per *612 capita cost of maintenance of such patients in such hospital. [Emphasis supplied]
Thus, under N.J.S.A. 30:4-68 the county of legal settlement is responsible for all care and maintenance costs of indigents hospitalized in state facilities. However, N.J.S.A. 30:4-78 provides that the county shall pay only one-half the actual per capita cost of maintenance of patients in "State hospitals for the mentally ill." Notwithstanding the language of N.J.S.A. 30:4-68 which calls for no such limitation, because of "historical precedent" the Department of Human Services has billed counties for only one-half the per capita rate for indigents hospitalized in any state institution, including those for the mentally ill. This suit follows the same "precedent" and seeks to recover one-half the per capita rate for patients hospitalized in any state institution.
As written, the law is clear and explicit with respect to a county's obligation for indigents having legal settlement therein.

II

GLEN GARDNER
N.J.S.A. 30:4-160 states:
The New Jersey State Hospitals, designated in section 30:1-7 of this Title as psychiatric hospitals, shall include the existing buildings and lands of the New Jersey State Hospital at Trenton, the New Jersey State Hospital at Greystone Park, the New Jersey State Hospital at Ancora and the New Jersey State Hospital at Marlboro, and all farms, grounds or places where the inmates thereof may from time to time be maintained, kept, housed or employed. [Emphasis supplied]
N.J.S.A. 30:1-7 provides:
The charitable, hospital, relief and training institutions and noninstitutional agencies of this State, within the meaning of this Title, shall include the following, and as well, any institution established hereafter for any similar purpose, as now established and as the same are to be hereafter maintained and operated pursuant to law:

Trenton Psychiatric Hospital,
Greystone Park Psychiatric Hospital,
Marlboro Psychiatric Hospital,
Ancora Psychiatric Hospital,
New Jersey Neuropsychiatric Institute,
North Jersey Training School at Totowa,
New Libson State School,
Woodbine State School,
Vineland State School,
Woodbridge State School,
Hunterdon State School,

*613 New Jersey Memorial Home for Disabled Soldiers at Menlo Park,
New Jersey Memorial Home for Disabled Soldiers, Sailors, Marines and their Wives and Widows at Vineland. [Emphasis supplied]
Glen Gardner was originally established in 1918 as the New Jersey Sanatorium for Tuberculosis. N.J.S.A. 30:4-158. It was later renamed the New Jersey Hospital for Chest Diseases and was classified under N.J.S.A. 30:1-7. Over the years its use as a hospital for chest diseases diminished and this facility was phased out in 1975. Because of a shortage of patient space at Trenton Psychiatric Hospital, this facility was reopened on January 1, 1977 as Glen Gardner Center for Geriatrics as a separate institution of the Division of Mental Health and Hospitals, to provide care and treatment for geriatric patients transferred by a Commissioner's order of transfer from Trenton Psychiatric Hospital. Glen Gardner provides nursing and psychiatric care exclusively for patients transferred from Trenton Psychiatric Hospital. Its treatment modalities include chemotherapy, behavior modification, activities of daily living, physical and occupational therapy, recreational activities, bowel and bladder retraining, sensory stimulation, remotivation therapy, and individual resident or family conference groups. A self-medication program is also available for qualified patients.
The authority for transfer of patients from Trenton Psychiatric Hospital to Glen Gardner appears in N.J.S.A. 30:1-12 which, in pertinent part, provides:
In order to implement the public policy of this State concerning the provision of charitable, hospital, relief and training institutions established for diagnosis, care, treatment, training, rehabilitation and welfare of persons in need thereof, for research and for training of personnel, and in order that the personnel, buildings, land, and other facilities provided be most effectively used to these ends and to advance the public interest, the commissioner is hereby empowered to classify and designate from time to time the specific functions to be performed at and by any of the aforesaid institutions under his jurisdiction and to designate, by general classification of disease or disability, age or sex, the classes of persons who may be admitted to, or served by, these institutions or agencies. [Emphasis supplied]
In view of the foregoing, I conclude that Glen Gardner falls within the ambit of N.J.S.A. 30:4-78 as a "State hospital *614 for the mentally ill" and that the reopening of Glen Gardner as an institution to provide care and treatment for geriatric patients of Trenton Psychiatric Hospital was within the Commissioner's legislative authority, N.J.S.A. 30:1-12, 30:1-7, as was the transfer of geriatric psychiatric patients from Trenton Psychiatric.
On the basis of affidavits and documentation submitted, I conclude that there is no genuine issue as to any material fact with respect to Hudson County's liability for its indigent patients hospitalized in Glen Gardner; therefor, Hudson County is responsible for one-half of the actual per capita cost of maintenance of its indigent patients at Glen Gardner.

III

A. MEDICAID  INTERMEDIATE CARE FACILITIES/MENTALLY RETARDED PROGRAM

B. ACCREDITATION

C. LICENSING

A. Medicaid  Intermediate Care Facilities/Mentally Retarded Program

The federal Medicaid program (Title XIX of the Social Security Act, 42 U.S.C.A. § 1396 et seq.) came into existence in 1965. The stated objective of this legislation is to improve the quality, quantity, efficiency, distribution and effectiveness of medical services throughout the country. Medicaid is an assistance program financed by the federal and state governments.
Title XIX requires states desiring to participate in the program to submit a state plan which must meet the conditions specified in the act and in the implementing federal regulations. Upon acceptance of the state plan, each participating state is given broad latitude in establishing its Medicaid program and is responsible for administering it. Within the parameters established by the act and the implementing regulations, each state determines the eligibility requirements for medical assistance.
*615 Medicaid varies from state to state and a state's participation in Medicaid is voluntary. Forty-nine states (Arizona is the only exception), the District of Columbia, Guam, Puerto Rico and the Virgin Islands are participants.
The Federal Government contributes from 50% to 83%, depending upon the average income of the participating state's inhabitants. In New Jersey the federal contribution rate is 50%. New Jersey is one of the 25 states in which Medicaid covers only people who are eligible for public assistance. In 27 states, the program is also available to people who are eligible for public assistance and some other low income people.
Title XIX of the Social Security Act enables states to take advantage of federal funding of a state-administered medical assistance program; 42 U.S.C.A. § 1396 et seq. In accordance with Title XIX, the New Jersey Legislature enacted a state Medicaid program; N.J.S.A. 30:4D-1 et seq. N.J.S.A. 30:4D-2, in pertinent part, states:
It is the intent of the Legislature to make statutory provision which will enable the State of New Jersey to provide medical assistance, insofar as practicable, on behalf of persons whose resources are determined to be inadequate to enable them to secure quality medical care at their own expense, and to enable the State, within the limits of funds available for any fiscal year for such purposes, to obtain all benefits for medical assistance provided by the Federal Social Security Act as it now reads or as it may hereafter be amended, or by any other Federal act now in effect or which may hereafter be enacted.
Under Title XIX appropriations are made available to those states which submit and have approved by the Secretary of Health, Education and Welfare plans for medical assistance which meet federal standards. 42 U.S.C.A. § 1396.
The federal legislation also requires that the state medical assistance plan:
... [P]rovide for financial participation by the State equal to not less than 40 per centum of the non-Federal share of the expenditures under the plan with respect to which payments under section 1396b of this title are authorized by this subchapter; and, effective July 1, 1969, provide for financial participation by the State equal to all such non-Federal share or provide for distribution of funds from Federal or State sources, for carrying out the State plan, on an equalization or other basis which will assure that the lack of adequate funds from local *616 sources will not result in lowering the amount, duration, scope, or quality of care and services available under the plan. [42 U.S.C.A. § 1396a(a)(2)]
Effective January 1, 1970, the New Jersey Medicaid plan provided that state funds be utilized to pay all nonfederal costs. On January 1, 1976 the New Jersey Medicaid plan was amended to provide for local participation, with state funds to be used to pay not less than 40% of the nonfederal share of the total expenditures. This amendment provided:
There is local participation. State funds are used to pay not less than 40 percent of the non-federal share of the total expenditures under the plan. There is a method of apportioning Federal and State funds among the political subdivisions of the State on an equalization or other basis which assured that lack of funds from local sources will not result in lowering the amount, duration, scope, or quality of care and services or level of administration under the plan in any part of the State. [§ 6.3(a), New Jersey State Plan for Medical Assistance (January 1, 1976)]
Under the amendment the State is required to pay at least 40% of the one-half nonfederal share of the total expenditures under the plan, with the counties contributing a maximum of 60%.
Until 1977 New Jersey's ICF/MR institutions were not participating in the Medicaid program. In July 1977 Governor Byrne advised HEW of New Jersey's desire to participate in the Medicaid intermediate care facilities program for the mentally retarded. That participation required federal certification, which, in turn, was dependent upon New Jersey upgrading and improving its facilities.
On October 19, 1977 Governor Byrne informed HEW of New Jersey's intention to amend its Medicaid plan to include the ICF/MR program which, as noted above, required that additional staff resources be used to bring New Jersey's facilities into compliance with federal regulations. Under the plan submitted and approved, HEW's regulations called for staff improvements by mid-1982. 42 C.F.R. §§ 442.113, .115.
The procedure undertaken by New Jersey was interim certification of institutions and gradual phasing in of facilities seeking Medicaid participation. The financing methodology utilized was a continuance of Title 30 funding of the ICF/MR institutions by *617 the State and counties and use of the matching federal funds for improvements. This objective was achieved by interim certification of the institutions for Medicaid participation as provided by federal regulations. 42 C.F.R. §§ 442.113, .115.
Assembly Bill 792, L. 1978, c. 19, was enacted on April 19, 1978 during the period of conversion to the ICF/MR Medicaid program. This bill was enacted "to maintain eligibility for reimbursement and to qualify additional facilities and programs for eligibility under the ICF/MR program." In pertinent part it provided:
... any required portion of the appropriation made heretofore to the Division of Mental Retardation and to any institution or program within that Division may be made available to the Division of Medical Assistance and Health Services by transfer or otherwise to constitute the nonfederal matching portion of the payments for medical assistance recipients under the ICF/MR program.
As structured and in practical application, the maintenance and care of a patient in an ICF/MR institution occurs as follows:
The Legislature approves a gross appropriation to the Division of Mental Retardation for the particular institution. The institution uses this appropriation to finance the daily maintenance of an individual patient. If the individual patient is eligible for Medicaid, a request for reimbursement is made to the State Division of Medical Assistance and Health Services (State Medicaid). Reimbursement is based upon an agreed medical-reimbursement per diem rate which, in the case of a New Jersey ICF/MR institution, results in a State Medicaid reimbursement to the Division of Mental Retardation of the 50% federal share. The funds representing the federal share are placed in a special control account and used to finance capital construction, physical improvements, additional staff and other related expenses to qualify and to meet ongoing federal compliance requirements to continue the institution's ICF/MR status. The expenditures made by the particular institution from the Legislature's appropriation are treated as the nonfederal portion or state match of the Medicaid payment and no actual transfer of money occurs *618 from State Medicaid to the Division of Mental Retardation representing the 50% nonfederal portion.
Under the New Jersey plan, if an indigent patient in an ICF/MR institution has legal settlement in a particular county, that county is billed for its share of the per capita cost of maintaining that patient. The funds received from the counties come to the State in the form of general revenues which are used to finance the appropriations made for the fiscal year. In the case of an ICF/MR institution, the revenues representing the county's share of per capita costs are used to finance the State's appropriation to that institution and compromise a portion of the nonfederal share of the Medicaid rate.
The federal funds received under the Medicaid program for indigents in ICF/MR institutions are not credited in satisfaction of a county's obligation under N.J.S.A. 30:4-68 or 30:4-78. Such funds are placed in a special account and used to finance capital construction, physical improvements and additional staffing. Thus, a county receives no credit for its obligations under Title 30 for an indigent in an ICF/MR institution, whereas federal funds received for indigents in state hospitals "for the mentally ill" are applied in satisfaction of a county's obligation under N.J.S.A. 30:4-68 or 30:4-78.
From my analysis of the New Jersey Medicaid legislation and Title 30 I find no merit to Hudson County's contention that an indigent's participation in or eligibility for Medicaid discharges or diminishes the county's responsibility under N.J.S.A. 30:4-68 or 30:4-78.
Title 30 was first enacted in 1918, amended in 1965 and most recently amended on March 14, 1980 (discussed infra). The State Medicaid law became effective in 1970. Considering that in enacting the State Medicaid law, the Legislature is assumed to have been thoroughly conversant with the provisions of Title 30, Brewer v. Porch, 53 N.J. 167, 174 (1969); the longstanding judicial interpretation of N.J.S.A. 30:4-68 and 30:4-78 imposing liability on a county for its indigents, In re Truslowe, 42 N.J. Super. *619 23, 28 (J. & D.R. Ct. 1956); the continued use of the same statutory language and failure to amend Title 30 or the State Medicaid law, Quaremba v. Allan, 67 N.J. 1, 14 (1975), I conceive a clear legislative intent to impose liability upon a county for its indigents without regard to an indigent's eligibility for or participation in Medicaid. Had the Legislature intended eligibility or participation in Medicaid to discharge, lessen or in any way affect a county's liability under Title 30, it would have acted to achieve this result when the Medicaid legislation was first enacted or at some point thereafter. Not having done so, I conclude that the Legislature intended the provisions of Title 30 to remain in full force and effect notwithstanding the contribution of the counties in funding the state match for participation in federal Medicaid, including ICF/MR. The compelling logic of this conclusion is amply buttressed by a review of N.J.S.A. 30:4-68.1, enacted March 14, 1980 (discussed infra).
In summary, I find that the New Jersey legislative scheme envisions and intends to impose liability under N.J.S.A. 30:4-68 and 30:4-78 on counties for its indigents; liability under these statutes is in no way affected by state or federal Medicaid legislation nor did the Legislature in enacting the State Medicaid plan intend to discharge a county's responsibility for its indigents under Title 30; the State Medicaid plan was amended on January 1, 1976 to achieve county contribution in supplying funds for the nonfederal match for Medicaid and this local contribution is entirely consistent with and expressly authorized by federal Medicaid law. 42 U.S.C.A. § 1396a(a)(2); N.J.S.A. 30:4D-7, 16, 30:4-68, 78.
While no direct attack has been made upon the different treatment accorded federal funds received under the Medicaid program for indigents in state hospitals "for the mentally ill" from funds received for indigents in ICF/MR institutions, I have considered this aspect and conclude that the action taken was within the permissible discretionary authority of the Commissioner, considering the magnitude of expenditures required *620 to qualify for an maintain federal funding for this program. This allocation has resulted in greatly enhanced services and facilities and was within the scope of the Commissioner's authority as delineated in N.J.S.A. 30:4D-7, which, in pertinent part authorizes and empowers the Commissioner to
... do or cause to be done all other acts and things necessary to secure for the State of New Jersey the maximum Federal participation that is available with respect to a program of medical assistance, consistent with fiscal responsibility and within the limits of funds available for any fiscal year, and to the extent authorized by the medical assistance program plan....
In their reply brief defendants suggest that the State Medicaid plan was not properly amended in 1976, that the amendment was not intended to apply to "the entire State plan" and that it violated the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq. Defendants have offered no competent proof or any citation of legal authority to support these contentions. The facts and law are to the contrary. That the entire state plan was amended to authorize local participation in financing Medicaid services is beyond doubt. A review of the amending document itself leads to no other conclusion. In addition, the clear and definitive testimony of Thomas M. Russo, Director of the Division of Medical Assistance and Health Services, impels this finding. There is no proof to the contrary.
Defendants' challenge to the 1976 amendment is inappropriate and untimely. R. 2:2-3(a); 2:4-1(b). Moreover, it is factually and legally deficient. The action of the Department of Human Services in amending the State Medicaid plan is presumptively authorized, reasonable and correct. It will not be upset, absent an affirmative showing that it was arbitrary, capricious or unreasonable. No such showing has been made by defendants. New Jersey Guild v. Long, 75 N.J. 544 (1978); In re Matter of Public Hearings, 142 N.J. Super. 136, 156 (App.Div. 1976); Consolidated Coal Co. v. Kandle, 105 N.J. Super. 104, 114 (App.Div. 1969), aff'd 54 N.J. 11 (1969).
Again, defendants have cited no legal authority to sustain their thesis that the amendment of the State Medicaid plan *621 fell within the Administrative Procedure Act. It is clear that this act does not apply to such an amendment of a congressionally authorized agreement between the Federal Government and the State. Nor does it fall within the definition of "an administrative rule." N.J.S.A. 52:14B-2(e).

B. Accreditation

Under Medicaid, when a provider institution is accredited by the Joint Commission for the Accreditation of Hospitals[2] it is entitled to receive Medicaid funds for maintenance costs of eligible patients. Application for accreditation is voluntary, but to qualify for Medicaid an institution must be so accredited. In New Jersey and Medicaid funds received for patients at an accredited state institution are credited to the account of the patients' county of legal settlement as part of that county's one-half cost of care and maintenance imposed by N.J.S.A. 30:4-68. If the state institution is not accredited or if the accreditation is lost, the county of legal settlement remains liable for the indigent's one-half maintenance cost share (except for legislation enacted March 14, 1980, discussed infra).
Hudson County contends that the State, by not having all of its institutions accredited by the Joint Commission, has deprived it of receiving credit for all eligible indigent patients at unaccredited institutions. Initially, I observe that there is no federal or state law mandating participation of a state institution in the federal Medicaid program nor does Title 30 anywhere refer to "accreditation" as a condition precedent to county liability. While accreditation is a prerequisite to participation as a "provider" in the Medicaid program, 42 U.S.C.A. § 1396(h)(i)(M), the failure of one or more state institutions housing indigent patients to be accredited by the Joint Commission, or the loss of *622 such accreditation,[3] in no way affects the county's responsibility under N.J.S.A. 30:4-68 or 30:4-78.
Hudson County's assertion that accreditation of a state institution is necessary before any liability arises for its indigents has no statutory or precedential support and is rejected. The statutory language is clear and unambiguous; the county's obligation under Title 30 remains undiminished.

C. Licensing

The same conclusion follows with respect to Hudson County's assertion that institutional licensure is a condition precedent to any liability under N.J.S.A. 30:4-68 or 30:4-78.
The county's reliance upon N.J.S.A. 26:2H-12, 14, and 18 is misplaced. These statutes play no role in the instant controversy and in no way derogate from the county's liability under Title 30 to bear its statutory share for Hudson County indigents in state institutions.
In view of the foregoing I find there is no genuine issue as to any material fact; Hudson County is responsible for one-half of the actual per capita cost of maintenance of its indigents at the 14 state institutions and specialized residential facilities forming the basis of this action.

IV

MEDICAID CREDITS
On March 14, 1980 the following law was enacted:
1. In the case of Medicaid and Medicare eligible patients, the maintenance costs to be paid by the counties shall be satisfied by Federal Medicaid or Medicare payments to the State. Should a State hospital for the mentally ill lose its accreditation and subsequently not receive Federal Medicaid and Medicare payments, the counties shall not be liable for the maintenance of Medicaid or Medicare eligible county patients.
In the case of any county which has incurred an obligation to the State for the maintenance of such patients between December 21, 1975 and January 1, 1980, 1/3 *623 of its obligation shall be forgiven. Any county which has made payments on account of such obligation shall receive a credit, to the extent that such payments exceed 2/3 of its total obligation, against obligations due to the State for other patients.
2. This act shall take effect immediately and be retroactive to January 1, 1980. [N.J.S.A. 30:4-68.1]
The parties have submitted conflicting proof with respect to the amount of credit due Hudson County under N.J.S.A. 30:4-68.1. According to plaintiffs' documentation, Hudson County is entitled to a credit of $549,990.98. According to defendants' documentation, the county is entitled to a credit of $732,763. Subsequent submissions indicate the differential of $182,772.02 is attributable to the parties' divergent views with respect to numerous variables, including the Medicaid status of particular indigents, which institutions house the indigents, and other factors. Thus, the actual credit due Hudson County is incapable of being resolved without a plenary hearing. Accordingly, the amount of the credits due Hudson County under the recently enacted legislation shall be determined at a hearing commencing at 9 a.m. on July 7, 1980.

V

PREJUDGMENT INTEREST
In New Jersey, unlike many other states, the award of prejudgment interest does not depend upon the existence of a statute; rather, it is a "judge made" rule. Busik v. Levine, 63 N.J. 351, 356 (1973). If the debt is liquidated or readily ascertainable, the legal rate of interest may be awarded on the theory that the creditor could have earned interest if the obligor had paid what was owed. Interest is viewed as compensatory. It is awarded to indemnify or make the claimant whole for the monies due which presumably would have earned interest if payment had not been delayed. It is also clear that a good faith but legally mistaken refusal to pay will not preclude the assessment of interest. Kamens v. Fortugno, 108 N.J. Super. 544, 553 (Ch.Div. 1970); Busik v. Levine, supra, 63 N.J. at 358; Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474 (1974).
*624 The county argues that ordinarily interest is not awarded against a government agency in the absence of a statute, citing Consolidated Police and Pension Fund Comm'n v. Passaic, 23 N.J. 645 (1957). It also relies upon Manning Engineering, Inc. v. Hudson Cty. Park Comm'n, 71 N.J. 145, 159 (1976), mod. on other grounds, 74 N.J. 113 (1977), to support its position that the existing "equities" militate against interest being awarded. The view and reasoning expressed in Consolidated Police, supra, has, however, been superseded by Busik, and Rova Farms, both supra, thereby depriving the county of the main vitality of its argument. Furthermore, the equitable factors found in Manning, supra, are notably absent in the present case. Considering that the county, without explanation or resort to the court for clarification of its position, simply stopped making payments it had previously made, the lack of a substantial controversy as to liability, that the amounts sought by plaintiffs were at all times readily ascertainable, and that the manner of arriving at the amounts due has never been challenged, I conclude that the equities prevail in favor of plaintiffs and that justice and fair dealing mandate that interest should be awarded. Busik and Rova Farms, both supra; Restatement, Contracts, § 337(b) (1932).
Plaintiffs further argue that N.J.S.A. 30:4-68.1 affords Hudson County relief only for the care and maintenance costs and not for interest. From my analysis of the legislative history, including a review of the original bill (which contained a specific reference to interest), Governor Byrne's message returning this bill to the Senate (which mentioned interest), and the bill as enacted (which deleted the reference to interest), I conclude that N.J.S.A. 30:4-68.1 affords relief to Hudson County for care and maintenance costs and does not provide such relief in the form of a credit for interest. This conclusion is entirely consistent with the underlying basis for which prejudgment interest is awarded. Under the extant circumstances I conclude that prejudgment interest is appropriate and justified.
*625 N.J.S.A. 30:4-79 obliged the county treasurer to pay the invoices rendered at the end of the quarter in which the particular services were rendered, i.e., April 1, July 1, October 1, January 1. Accordingly, on the basis of the documentation submitted and using these dates, prejudgment interest in the amount of $901,140.80, representing interest through March 15, 1980, is awarded.

VI

COUNTERCLAIM
The allegations of defendants' counterclaim are without factual or legal support; accordingly, it is dismissed.
NOTES
[*] Not all buildings at this location qualify as ICF/MR.
[2] An organization established in 1951 by the American College of Physicians, the American College of Surgeons, the American Hospital Association and the American Medical Association to carry on a program of hospital accreditation.
[3] But see N.J.S.A. 30:4-68.1, discussed infra.