152 N.J. Super. 191 (1977)
377 A.2d 915
PUBLIC INTEREST RESEARCH GROUP OF NEW JERSEY, INC., DAVID CACCIA, AND THE SUN PEOPLE  ALTERNATE ENERGY ADVOCATES, INC., APPELLANTS,
v.
STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, AND PUBLIC SERVICE ELECTRIC AND GAS COMPANY, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 31, 1977.
Decided July 11, 1977.
*197 Before Judges CARTON, KOLE and LARNER.
Mr. Edward Lloyd argued the cause for appellants.
*198 Mr. Rex William Potter, Assistant Deputy Public Advocate, argued the cause for amicus curiae Public Advocate of the State of New Jersey (Mr. Stanley C. Van Ness, Public Advocate, attorney).
Mr. Richard Fryling, Jr. argued the cause for respondent Public Service Electric and Gas Company.
Mrs. Erminie L. Conley, Deputy Attorney General, argued the cause for respondent Coastal Area Review Board in the Department of Environmental Protection (Mr. William F. Hyland, Attorney General, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel).
The opinion of the court was delivered by LARNER, J.A.D.
This is an appeal from the determination of the Coastal Area Review Board (Board) affirming the issuance of a permit to Public Service Electric and Gas Company (PSE&G) and Atlantic City Electric Company[1] to construct a nuclear plant for generation of electrical power. Such a permit is a prerequisite to construction of the facility since the site is located within the boundaries of the "coastal area" delineated in the Coastal Area Facility Review Act (CAFRA  N.J.S.A. 13:19-1 et seq.). See Toms River Affiliates v. Dept. of Environm. Protection, 140 N.J. Super. 135 (App. Div. 1976), certif. den. 71 N.J. 345 (1976).[2] The act is administered by the Department of Environmental Protection of the State of New Jersey through its Commissioner, who issued the permit pursuant to his statutory authority. An appeal to the Board pursuant to N.J.S.A. 13:19-13 resulted in an affirmance, from which the appeal was taken to this court.
*199 The project is to be known as Hope Creek Generating Station Units 1 and 2, consisting of a two-unit power plant on Artificial Island on the east bank of the Delaware River in Salem County. The island, which in reality is a peninsula, was created by dredging and filling commencing in the early part of this century. It consists of a strip of land one mile wide and three miles long which is best characterized as tidal marsh and meadowlands. The site is zoned for industrial use, with the surrounding area undeveloped and the nearest residence in all directions approximately three miles distant. There are also two other nuclear units at the site, one in use and one in the process of construction, known as Salem Electric Generating Station, which were developed prior to the effective date of CAFRA and thus exempt from its application. See N.J.S.A. 13:19-5.
The Hope Creek project had its genesis in an initial application in 1970 by PSE&G to the Federal Atomic Energy Commission[3] for a construction permit at a site on Newbold Island in the Delaware River. After considerable investigation and study, NRC recommended to PSE&G in 1973 that Artificial Island would be a more suitable site for the plant because of considerations of population density. As a consequence, an amended application was filed changing the location of the station to Artificial Island.
Thereupon, NRC undertook an exhaustive review of the application pursuant to its functions under applicable federal statutes and regulations, evaluating the documentation submitted by the applicant as well as independent calculations and studies by NRC's staff of experts, accompanied by mandated public hearings. Pursuant to federal requirements *200 NRC, through its Directorate of Licensing, filed an exhaustive scientific analysis and report of all the criteria relevant to the proposed nuclear power plant at the site in question in the form of a Final Environmental Statement. Ultimately NRC granted a construction permit on November 4, 1974, subject to certain conditions to be met prior to the issuance of an operational permit. Essentially, NRC found that no significant adverse environmental impacts would occur from normal operational releases of radioactivity from the nuclear units at the site, from the potential occurrence of accidents at the plant or from transportation of radioactive material. NRC concluded that "the proposed facilities can be constructed and operated at the proposed location without undue risk to the health and safety of the public" and "[t]he issuance of permits for construction of the facilities will not be inimical to the common defense and security or to the health and safety of the public."
One of the conditions of the NRC order was that no concrete be poured for the structures until further approval after a staff study of possible interaction between river traffic hazards from liquefied natural gas tankers and safety-related plant features. Subsequently the matter was studied and analyzed by the NRC staff, which concluded that the condition which stayed construction had been satisfied. Thereafter intervenors, represented by the Public Advocate of New Jersey and other counsel, were admitted to this proceeding and an evidentiary hearing was held by the Atomic Safety and Licensing Board of NRC.
Subsequent to such hearing the NRC Licensing Board filed a comprehensive supplemental decision and order on March 28, 1977, concluding that there was no need for design change because of alleged risks of accidents caused by river traffic relating to tanker transportation of liquefied natural gas. The Board also concluded that because the environmental risk of a river accident was so remote and speculative, no further supplemental environmental statement was warranted. In addition, the decision undertakes to answer *201 other objections relating to safety factors involving unanticipated occurrences within and around the plant. As a result of this supplemental study and hearing, the condition staying construction was removed.[4]
We note that in addition to construction approval by NRC, PSE&G has gone through the gamut of applications to and approvals by a host of other federal and state agencies having jurisdiction over various facets of the environment potentially affected by the proposed project. Among these agencies are the United States Army Corps of Engineers, United States Environmental Protection Agency, United States Department of Transportation, Federal Aviation Authority, Delaware River Basin Commission, New Jersey Department of Labor and Industry, the New Jersey Department of Environmental Protection, particularly the Division of Water Resources and Environmental Quality and the Bureaus of Air Pollution Control and Radiation Protection.
PSE&G filed its CAFRA application in February 1974, including with its submission the Environmental Impact Statement prepared by the Directorate of Licensing of NRC. The application was found to be insufficient by the State Commissioner of Environmental Protection and accordingly additional information was submitted by the applicant. Pursuant to N.J.S.A. 13:19-8, the Commissioner declared the application to be complete and accepted it as filed. Two public hearings were then held on August 14, 1974 and May 23, 1975 by a hearing officer of the Department. None of the appellants was present or represented at the first hearing, while Mr. David Caccia and Mrs. Ruth Fisher of the Cape May County Isaak Walton League of America appeared in opposition to the application at the second hearing. *202 The hearing consisted of an informational proceeding, with the opportunity given to all interested parties to express their views on the application.
Thereafter, based upon all documentary data, the transcript of the hearings, the expertise of the Commissioner and his staff, the scientific studies of NRC and other scientific information and analyses, the Commissioner filed a thorough and comprehensive opinion which reviewed the facts and criteria relevant to permit approval under CAFRA and found that there was sufficient compliance with all the legislative requirements for issuance of a permit as contained in N.J.S.A. 13:19-10 and 11.
Accordingly, he approved the issuance of a construction permit, subject to certain conditions which will be discussed later in this opinion. The Commissioner's opinion also outlined review procedures of appeal available to any aggrieved party: (1) to the Coastal Area Review Board with the review restricted to policy matters, or (2) a plenary (quasi-judicial) hearing before a hearing officer appointed by the Commissioner to make findings of fact, conclusions of law and recommendations to the Commissioner. Although appellant Public Interest Research Group of New Jersey, Inc. (PIRG) did not participate in the proceeding up to that point, it opted for the policy review and filed a notice of appeal to the Board. Two other interested parties filed an appeal from the Commissioner's decision to the Board by letter, followed by a similar appeal by the Public Advocate of New Jersey.
After briefs and oral arguments the Board on January 20, 1976 unanimously affirmed the Commissioner's decision to grant the permit, which was formally issued on February 1, 1976. PIRG, The Sun People  Alternate Energy Advocates, Inc. and David Caccia appeal from the determination of the Board, and the Public Advocate appears amicus curiae in opposition to the decision below. PSE&G and the Coastal Area Review Board appear as respondents in support of the Board's decision.
*203 In our review of this administrative decision we are necessarily limited to a narrow function, namely, to determine whether there is sufficient evidence in the record as a whole to justify the determination reached below. Such a limited scope of review is particularly significant in this area of highly technical and scientific knowledge, wherein a court must accord a high degree of deference to the administrative agency and its expertise. For an interesting discussion of the judicial role in reviewing environmentally-related administrative decisions see the opinions in Ethyl Corp. v. Environmental Protection Agcy., 176 U.S. App. D.C. 373, 541 F.2d 1 (D.C. Cir.) (en banc), cert. den. 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976). See also, American Paper Inst. v. Train, 177 U.S. App. D.C. 181, 543 F.2d 328, 338 (D.C. Cir.), cert. dism. 429 U.S. 967, 97 S.Ct. 398, 50 L.Ed.2d 335 (1976); Shahmoon Indus., Inc. v. Dept. of Health, N.J., 93 N.J. Super. 272 (App. Div. 1966). And if the record reasonably supports the conclusion below, the court must presume the validity of the analysis made by those having the expertise and training relevant to the subject matter involved.
Appellants advance the following grounds for reversal of the determination below:
(1) Failure of the Commissioner to afford a trial-type adversary hearing with all traditional rights of due process inherent therein invalidates the conclusion granting the permit;
(2) The Commissioner did not have the authority to issue a conditional construction permit subject to further compliance and further permits in the future;
(3) There is insufficient evidence in the record relating to the disposition of radioactive waste in the form of spent fuel rods so as to justify the issuance of the permit;
(4) The environmental impact statement filed by the applicant was fatally inadequate in that it failed to consider alternative methods of generating electricity without the construction of a nuclear power plant.
The argument of amicus concentrates upon the insufficiency of the Environmental Impact Statement filed by *204 PSE&G, urging a reversal to require the applicant to renew the process by filing an amended Environmental Impact Statement which will specifically relate to energy conservation as an alternative to the need for construction of the nuclear power plant. In support of its position, amicus has submitted to us a "Study of Electrical Energy Usage in the Public Service Electric & Gas Co. Service Territory, State of New Jersey", dated June 30, 1976, prepared by Dubin-Bloome Associates, Energy Management Consultants, in connection with a rate case. This study was not before the Commissioner or the Board and was therefore not considered by them in arriving at a conclusion.
A motion to strike this exhibit from the appellate record, made by respondents, was reserved for decision after the consideration of this appeal.
Since our function is to review the administrative decision based upon the record made before the agency rendering that decision, we cannot and should not undertake to evaluate the propriety of the determination on appeal by a consideration of evidential material not presented to the designated administrator having the expertise to decide the issue in the first place. See R. 2:5-4 and 5. Such permissiveness would destroy the essence of the appellate process. We conclude that the submission of this exhibit as an expert's opinion at this late date is wholly unwarranted and that the motion to strike should be granted. This study therefore has not been considered by us in our determination of the merits of the appeal.

I.
Appellants urge that the hearing contemplated by CAFRA (N.J.S.A. 13:19-9(a)) and the provisions of the Administrative Procedure Act (N.J.S.A. 52:14B-10(a)) is an adversarial hearing including cross-examination of witnesses and findings of fact and conclusions of law limited to the record evidence. The hearings below were in fact not conducted in the form of a trial, witnesses were not sworn, and *205 parties were advised that cross-examination would not be permitted. In substance, all interested persons were given the opportunity to present their positions orally and in writing for the purpose of adding to the information and data available to the Commissioner in evaluating the application and deciding whether or not to grant the permit. It was thus a quasi-legislative hearing rather than an adversary hearing with the normal trappings of a full-blown trial.
The Administrative Procedure Act mandates a trial-type hearing in contested cases. N.J.S.A. 52:14B-10(a). A "contested" case within the meaning of that section is defined as:

52:14B-2(b):
"Contested case" means a proceeding, including any licensing proceeding, in which the legal rights, duties, obligations, privileges, benefits or other legal relations of specific parties are required by constitutional right or by statute to be determined by an agency by decisions, determinations, or orders, addressed to them or disposing of their interests, after opportunity for an agency hearing.
It is apparent from the foregoing that the guarantee of a full adversary trial is reserved for those cases in which the legal rights and duties of "specific parties" are at issue and required to be determined by a decision disposing of their interests because of "constitutional right" or "statute." Since the objectors-appellants have no "particularized property rights or other special interests" which can be affected by the administrative determination, they are not entitled to a true adversary hearing either on a constitutional due process basis or as a matter of "fundamental fairness" and "administrative due process."[5] See Cunningham v. Civil Service Dept., 69 N.J. 13, 24-26 (1975).
*206 As observed by Justice Schreiber in Cunningham:
The crucial questions are whether the fact finding involves a certain person or persons whose rights will be directly affected, and whether the subject matter at issue is susceptible to the receipt of evidence. [at 22]
If the appellants herein have no constitutional right to an adversary proceeding, the quoted section of the Administrative Procedure Act (N.J.S.A. 52:14B-2(b)) would require a statutory guarantee of such a hearing. The pattern and purpose of the CAFRA legislation lead to the conclusion that the Legislature intended that the hearing held by the Commissioner in conjunction with the application for a construction permit be informational in nature in order to permit members of the public to present their views and relevant data as an aid to the administrative decision on the particular application as well as long-term planning policy for the entire Coastal Area.
N.J.S.A. 13:19-9 provides:

Hearing; submission of additional information
a. The commissioner, or a member of the department designated by him, shall hold a hearing to afford interested parties standing and the opportunity to present, orally or in writing, both their position concerning the application and any data they may have developed in reference to the environmental effects of the proposed facility.
Merely because the duty is imposed on the agency to receive and consider evidence in connection with a hearing provided for in the statute, it does not per se signify that the hearing is to be of the trial type. See In re Matter of Public Hearings, 142 N.J. Super. 136, 151 (App. Div. 1976). There is no affirmative reference in this statute applicable to this proceeding which mandates a trial-type hearing as prescribed by the Administrative Procedure Act.
Other facets of the legislative scheme also point to the inappropriateness of a full-blown trial to the subject matter *207 encompassed therein. For example, N.J.S.A. 13:19-9(b) authorizes the Commissioner to require the applicant to submit additional information subsequent to the hearing which may be necessary for the complete review of the application. The Commissioner is granted great flexibility to gather information from all sources, whether it be from the documentation with the application, the public hearing or other available data, so that he can arrive at a policy decision which will carry out the purposes of the act not only in the determination of the particular application before him but also in the preparation of an overall plan for land uses and facilities in the designated Coastal Area. See N.J.S.A. 13:19-16. The hearing afforded below fully complied with the requirements of CAFRA and the Administrative Procedure Act.
A similar question was decided by this court in connection with an appeal from the determination of the Department of Environmental Protection granting a permit under the Coastal Wetlands Act. N.J.S.A. 13:9A-1. See In re Environmental Protection Dep't, 139 N.J. Super. 514 (App. Div. 1976). The Wetlands Act does not itself provide for a hearing before the issuance of a permit. However, the regulation and order of the Department require a "hearing to afford interested parties standing and the opportunity to present, orally or in writing, both their position concerning the application and any data they may have developed in reference to the environmental effects of the proposed activity." N.J.A.C. 7:7A-4.6(a).[6] This language is identical with that contained in CAFRA, N.J.S.A. 13:19-9(a). We held in In re Environmental Protection Dept., supra, 139 N.J. Super. at 516, that "[T]he hearing is not adjudicatory *208 and is not required to be conducted as a `contested hearing' under the Administrative Procedure Act." See In re Matter of Public Hearings, supra, 142 N.J. Super. at 154; Consolidation Coal Co. v. Kandle, 105 N.J. Super. 104, 118 (App. Div.), aff'd o.b. 54 N.J. 11 (1969). See also, Norwegian Nitrogen Prod. Co. v. United States, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933); 1 Davis, Administrative Law, § 702 (1958); Davis, "The Requirement of a Trial-Type Hearing," 70 Harv. L. Rev. 193, 199 (1956).
It follows that as long as members of the public were afforded an opportunity to be heard and present their views at a public hearing, orally or in writing, the statutory prerequisites of CAFRA and the Administrative Procedure Act were met, and the hearing did not violate any rights of the appellants, constitutional or otherwise.
It is also noteworthy that the Commissioner and his Department exceeded the statutory requirements by granting an aggrieved party after the decision a method of review through a quasi-judicial hearing which would have comported with the trial safeguards now sought by appellants. These appellants waived this type of administrative appellate process and requested instead a policy review by the Board. Without determining whether such a post-decision opportunity for a trial-type hearing by way of review would suffice to cure the deficiency in a case where an adjudicatory hearing is mandatory, nevertheless the conduct of the parties below points to the absence of prejudice as a basis for appellate intervention.

II
The construction permit granted by the Commissioner is revocable and subject to many conditions with which the applicant must comply in order to secure final approval to operate the facility. Among the series of conditions relating to steps to be taken to protect the environment, to monitor the effects on the environment and to incorporate new and *209 advance technology to promote public health, safety and welfare, the Commissioner's opinion imposes a caveat referable to salt emissions from the cooling towers incorporated in the plant design. The major issue raised by appellants revolves about the design and operative efficiency of two 500-foot cooling towers which are planned to cool the hot water emissions from the plant before they are dissipated in the atmosphere. Because of the salinity of the intake water from the Delaware River the problem is whether the tower emissions, resulting from the cooling process and which will ultimately be deposited through drift upon a large area, will contain an acceptable minimum of salt so as to avoid any harmful effects on the environment.
The Commissioner incorporated the following NRC conditions relating to the cooling towers:
(a) Demonstrate prior to initial power operation that the low drift goal of 0.002% for cooling tower operation and low salt deposition rate can be achieved and maintained throughout the life of the plant. A preoperational and operational monitoring program acceptable to the NRC Regulatory staff shall be conducted to evaluate the effects of salt deposition on terrestrial life and structures, and
(b) Monitor the performance of the plant cooling towers at reasonable intervals to evaluate the salt and chemical deposition rate and possible effects on the environment. If such deposition caused detrimental effects to the environment in Lower Alloways Creek Township or if the deposition rate or amounts exceed those that are deemed non-detrimental to human, plant, or animal life, then remedial steps will be taken.
He then proceeded to spell out the relevant conditions to the CAFRA permit:
As a condition of this permit, preoperational and operational monitoring programs to evaluate the effects of salt deposition on terrestrial life and structures acceptable to the department shall be undertaken. If such deposition causes detrimental effects on the environment, remedial steps acceptable to the Department shall be taken. *210 This condition is further summarized in the Statement of Conditional Approval as follows:
PSE&G shall design and carry out a preoperational and operational monitoring program to evaluate the effects of salt released from the cooling towers on terrestrial life and structures; such program shall be submitted to DEP for approval. If salt deposition during operation causes detrimental effects, PSE&G shall take such remedial steps as DEP believes appropriate.
Appellants urge that the issuance of the construction permit in the face of the failure of the applicant to eliminate the potential deficiency resulting from the lack of data relating to salt emissions from the cooling towers violates N.J.S.A. 13:19-10. This section generally requires the Commissioner to issue a permit only if he finds that the proposed facility:
a. Conforms with all applicable air, water and radiation emission and effluent standards and all applicable water quality criteria and air quality standards.
b. Prevents air emissions and water effluents in excess of the existing dilution, assimilative, and recovery capacities of the air and water environments at the site and within the surrounding region.
It is in this connection that appellants assert that there was insufficient evidence for the Commissioner to base his findings of compliance with § 10(a) and (b). As a corollary they state that the statutory mandate requires absolute compliance with all the requirements of § 10 prior to the issuance of a permit together with definitive findings by the Commissioner as a condition precedent thereto. Appellants thus take the position that the Commissioner lacks the power or flexibility to grant a permit on conditions to be met by the applicant thereafter.
A literal reading of § 10 might support the contention of appellants, for there is no express recognition in that section of the right of the Commissioner to issue a permit subject to compliance with conditions which must be carried *211 out before the plant may operate. Nevertheless, it would be wholly unrealistic to assume such a narrow legislative intent in a statute which grants such broad powers to the Commissioner to administer the implementation of the legislative purposes expressed in CAFRA.
As we stated in Toms River Affiliates v. Environ. Protec. Dept., supra:
The legislation at issue sets forth specific criteria which must be met for the issuance of a permit for a proposed facility. N.J.S.A. 13:19-10. Many of these criteria may not be relevant to an application for a housing facility. Nevertheless, the standards outlined therein establish an adequately defined checklist for the guidance of the agency in granting or denying a permit  a checklist which has sufficient flexibility to carry out the purposes of the legislation in light of the rapidly changing conditions and body of scientific knowledge in the area of environmental protection. [140 N.J. Super. at 144]
We find no inherent impropriety in the issuance of a provisional permit. In fact, the nature of the subject matter, involving highly complex scientific knowledge and developments which are necessarily evolutionary, dictates the need for such provisional treatment. Since there is an inevitable lapse of years between the commencement of construction and the final installation and testing of the equipment designed to reduce environmental impacts, it is in the best interests of the public that the final product embody the best and latest scientific advances in the field. To lock into a design or equipment based upon the state of the art at the time of commencement of construction is to place greater emphasis upon form than upon the potential benefits which may result by the time the plant is operational.
In Power Reactor Develop. Co. v. Electrical Union, 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961), a case involving the Atomic Energy Act, 42 U.S.C.A. § 2235, and the Commission's regulations thereunder, the court approved the statutory two-step procedure of a construction permit to be followed by an operation permit after completion of *212 construction in order to bring the original application up to date and to compel submission of final data to establish adequate protection for the health and safety of the public. Justice Brennan's observation is particularly pertinent:
For nuclear reactors are fast-developing and fast-changing. What is up to date now may not, probably will not, be as acceptable tomorrow. Problems which seem insuperable now may be solved tomorrow, perhaps in the very process of construction itself. [367 U.S. at 408, 81 S.Ct. at 1535, 6 L.Ed.2d at 932]
In this volatile field of scientific knowledge, it would be foolhardy and unreasonable to tie the hands of the Commissioner proscribing the flexibility necessitated by the nature of the facility involved herein. A grant of authority to an administrative agency entrusted with the exercise of the expertise applicable to the regulated activity should be liberally construed so as to enable it to discharge its statutory responsibilities. In re New Jersey Cable Television, 132 N.J. Super. 45 (App. Div. 1974), certif. den. 67 N.J. 95 (1975).
The Commissioner articulated the reasons for the issuance of the conditional permit in the following excerpt from his opinion:
This opinion is focused on an environmental assessment of the effects of the construction and operation of the proposed plant. It is important to recognize the inherently evolutionary nature of the design and construction of any large industrial facility such as Hope Creek. This complicates the ability of DEP to fully and quantitatively predict in advance the last detail of its impact. To be more concrete, the overall design and even general technical specifications of Hope Creek are now known  it will be a boiling water reactor (rather than a pressurized water reactor), it will have cooling towers (rather than once-through cooling), etc. Thus DEP can with some confidence predict the overall impacts based on these choices. Because of the towers, for example, thermal loading on the Delaware will be drastically reduced over that from once-through cooling, but instead there will be the likelihood of fogging and salt deposition from the towers that would not be associated with once-through cooling. Standard engineering practice is generally to evaluate major options first (towers versus once-through cooling), make a choice, then later develop the more detailed design and technical specifications for the choice made. Thus PSE&G chose towers as *213 a fundamental choice, but as of this time has not developed the detailed technical specifications for the heat exchange rates, concrete strength, mist eliminators, and many other specific components of the towers. DEP's implementation of CAFRA for industrial facilities must recognize the realities of this process. In the case of Hope Creek, this is being done in two ways. First, in the review of the overall facility and its major components, DEP has determined that, based on the general nature and impact of the major components, there will be no violations of the spirit and purposes of CAFRA. Second, for those components whose specifications are available in sufficient detail at this time, the specific affirmative findings required by Section 10 can be made. (Obviously a determination that a component did not meet DEP requirements would result in a negative finding and the CAFRA permit would not be issued.) For those components for which detailed technical specifications or choices have not yet been made by PSE&G, DEP requires PSE&G to later obtain specific permits at the appropriate time in the design and construction process, and makes this requirement a condition to the present permit. In addition to reflecting the realities of the construction process, for Hope Creek, this reflects DEP's judgment that, for all the components not yet fully designed technologies do in fact exist which will meet the applicable DEP codes and requirements, including the provisions of CAFRA.
We do not mean to suggest that the Commissioner is empowered to grant a permit, even a conditional one, without sufficient evidential support in the record. A perusal of the documentation available below amply supports the conclusion of the Commissioner to grant the permit despite unresolved questions as to the ultimate solution of the environmental effect of the salt emissions from the cooling towers. He had before him the Final Environmental Statement of NRC of February 1974, which explored the specific problem of salt emissions. After a review of the scientific data relevant to the issue at hand, the Environmental Statement concludes:
Deposition of salt resulting from operating the cooling towers within present design criteria is expected to have no significant effect on the regional ecosystem.

* * * * * * * *
The intent of the Staff calculations was to obtain conservative estimates of maximum expected effects rather than to predict the actually expected distribution of airborne salt around the plant site. *214 Since the results of these conservative estimates indicated that even under the most extreme conditions the effects of salt deposition will not be significant (Section 5.1.1), further detailed analysis was not considered necessary.
As noted in Section 5.1.1, the airborne salt concentrations from the Hope Creek cooling towers are a relatively minor addition to an already existing natural background of airborne salt concentrations, and are below the threshold level for long-term effects. With respect to deposition of salt on the ground, again the station cooling towers contribute only a small fraction of the naturally-occurring background. In view of the high solubility of salt and the frequent and annually well-distributed rainfall in the region, a significant accumulation of salt deposits over the years is not expected. To the extent that the cooling tower operation adds to the equilibrium conditions resulting from the natural background of airborne salt concentrations, an increase in the salt concentrations in the soil is to be expected. However, the staff does not anticipate a continual buildup of any significance over the operating lifetime of the proposed station.

* * * * * * * *

Comment:
Cooling towers use saline water. Report indicates that towers will be first large scale type in existence. If unsuccessful and they emit substantially more salt, what alternate means are contemplated?

Response:
The staff's evaluation indicates that far less salt deposition will occur from cooling tower operation than that sufficient to cause significant adverse environmental effects. For additional conservatism the staff assumed a 0.00375% drift rate instead of the 0.002% rate (with its corresponding lower potential for salt emission) specified by the applicant for cooling tower design (Hope Creek Supplemental Environmental Report, Subsection 6.2.1). In the unlikely event that salt emission should be unacceptable, plant modifications would be required. Such modifications could include modified or additional drift eliminators, or reducing the concentration factor in the circulating water system. Operational experience with the Fork River towers (scheduled to commence in 1978) should be available by the time the Hope Creek Units begin operation.
Under the circumstances of this case involving a body of scientific knowledge in the stage of rapid development together *215 with a record of proposed designs of the cooling towers pointing to ultimate compliance with acceptable emission standards, the decision to grant a conditional construction permit was reasonable and appropriate and within the broad discretionary power vested in the Commissioner under the controlling statute. Such action was not arbitrary or capricious and therefore beyond the pale of judicial intervention.

III
The Commissioner's opinion found that the proposed facility complied not only with the criteria of § 10(a) and (b) of the statute but also with the criteria mandated by the other provisions of § 10, including (c), (d), (e), (f) and (g). He also found specifically that the statutory criteria of § 11 were met:
The proposed method for disposal of radioactive waste material to be produced or generated by this facility: (i) will be safe insofar as it takes place within the State of New Jersey, (ii) conforms to standards established by the Nuclear Regulatory Commission, and (iii) will effectively remove danger to life and the environment from such waste material, provided the conditions of the permit are met.
Appellants claim that this finding as to the safety of the proposed method for disposal of the radioactive waste material produced by the facility is unsupported by the available data in the record. The waste material referred to consists of spent fuel rods which contain long-life radioactive material and require extreme care in disposal to avoid contamination of the atmosphere and the concomitant danger to health and life.
Appellants' contention on this score is without merit. The Federal Government, by virtue of the Atomic Energy Act (42 U.S.C.A. § 2011 et seq.), has exclusively preempted the aspect of regulation which involves protection against radiation hazards.
*216 The landmark case of Northern States Power Co. v. Minnesota, 447 F.2d 1143 (8 Cir.1971), aff'd mem. 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972), holds that the Federal Government has preempted the field of regulation of construction and operation of nuclear facilities so far as they relate to safety hazards resulting from the effects of radiation.[7] See also, State v. Jersey Central Power & Light Co., 69 N.J. 102, 111-113 (1976). The only caveat to this exclusive federal jurisdiction is the proviso that nothing in the act "shall be construed to affect the authority of any State or local agency to regulate activities for purposes other than protection against radiation hazards." 42 U.S.C.A. § 2021(k).
In view of the comprehensive nature of the federal legislation and regulations, the State Commissioner has no power under CAFRA to make an independent judgment as to the ability of the planned facility to protect against radiation hazards either from the operation of the plant or from the handling of radioactive waste material created by the nuclear process.
The Commissioner does have the statutory obligation to satisfy himself that the applicant has conformed to the standards established by NRC. N.J.S.A. 13:19-11. However, if such standards are met, he has no authority to impose either lower or higher safety standards to regulate radiation hazards.
The Environmental Statement of NRC adequately deals with the problem of disposal of radioactive wastes and the potential facilities for such disposal in the following:
Further, the potential for any significant effect from the disposal of solid radioactive wastes from a reactor is extremely limited due *217 to (1) the small quantity of radioactivity contained in the wastes, and (2) the care taken in establishing and monitoring commercial land burial facilities as noted below. Commercial land burial facilities must be located on land which is owned by a State or the Federal government, and after radioactive wastes are buried at a site the land must not be used for any other purpose. Authorization to operate a commercial land burial facility is based on an analysis of the nature and location of potentially affected facilities and of the site topographic, geographic, meteorological, and hydrological characteristics; which must demonstrate that buried radioactive waste will not migrate from the site. Environmental monitoring includes sampling of air, water and vegetation to determine migration, if any, of radioactive material from the actual location of burial. To date, there have been no reports of migration of radioactivity from commercial burial sites. In the event that migration were to occur, plans for arresting any detected migration have been developed. On the basis of the general environmental considerations of burial sites now developed, the wide range of wastes that can be buried, and the observation that an applicant is not restricted to a specific burial site, the staff believes that a more detailed discussion of solid radioactive waste disposal sites is inappropriate to an environmental statement for any one nuclear power plant facility.
Furthermore, the supervision, monitoring and notice requirements inherent in the conditions engrafted upon the permits issued by both the federal and state agencies are appropriately designed to assure full compliance with safety standards pertaining to the disposition of radioactive wastes when those wastes are created in the future operation of the plant. The imposed conditions adequately reserve to the appropriate agency the right to require procedures and controls to protect the public from dangers arising out of the disposition of such wastes. We think it premature and unreasonable to demand at this time the specifics of the waste disposal process as a condition precedent to the issuance of a construction permit. The consideration of the issue by NRC and the Commissioner, together with the conditions attached to the federal and state permits, reflect a reasonable administrative resolution to which we defer in view of the expertise of the agencies charged with the implementation of the safety requirements of such a nuclear project.
Without detailing the other findings of the Commissioner or the evidence relating to them, we conclude that *218 his determination that the applicant complied with the remaining criteria set forth in §§ 10 and 11 of the act are reasonably supported by sufficient evidence in the record as a whole, giving due regard to the expertise of the Commissioner and his staff. See, e.g., Mayflower Securities v. Bureau of Securities, 64 N.J. 85, 92-93 (1973); In re Hackensack Water Co. Application, 132 N.J. Super. 296, 301-302 (App. Div. 1975); Essential S. & L. Ass'n v. Howell, 105 N.J. Super. 424, 432 (App. Div. 1969).

IV
Appellants and amicus further contend that the Environmental Impact Statement submitted with the PSE&G permit application was inadequate in several respects and that such deficiencies mandate a reversal. The thrust of their argument is that the Environmental Impact Statement filed pursuant to N.J.S.A. 13:19-7(g) fails to consider alternatives to the construction of the nuclear energy plant by way of energy conservation or other methods of generating electrical energy.
Preliminarily, we note that the function and purpose of the Environmental Impact Statement required by CAFRA is entirely different from the purpose of such a statement in the administration of the National Environmental Policy Act. In the context of the federal act the statement is the work product of the staff of the Directorate of Licensing of NRC, resulting from a review of the application and the staff's analysis of all the available data. See National Environmental Policy Act, 42 U.S.C.A. § 4332(C) and (D); Calvert Cliffs' Coord. Com. v. United States A.E. Com'n, 146 U.S. App. D.C. 33, 449 F.2d 1109 (D.C. Cir.1971). The federal act requires a detailed and complete statement as a condition precedent to the decision of the agency, and as such it is part of the decision-making process of the agency itself. As a consequence, an impact statement under the federal act which does not explore *219 and consider all relevant problems, including alternatives to nuclear generation, is fatal to the validity of the permit. See Aeschliman v. United States Nuclear Reg. Comm'n., 178 U.S. App. D.C. 325, 547 F.2d 622, 627 (D.C. Cir.1976); Calvert Cliffs', supra.
Under CAFRA the Environmental Impact Statement is simply part of the informational data submitted with the application. If the statement or application is incomplete, the Commissioner may request additional data or amendments to correct deficiencies. And the application is not considered to be filed until the Commissioner declares it to be complete. N.J.S.A. 13:19-8.
Under this procedural format the Environmental Impact Statement is no more than a preliminary document required to establish a starting point for the investigation, examination and consideration by the Commissioner. Although it must be considered, it is not a product of the decisional process of the agency. Nor is its contents statutorily made a condition precedent of the issuance of the permit. Under CAFRA, when the Commissioner declares the application to be complete, he certifies that the documentation submitted by the applicant, including the impact statement complies with the statutory prerequisites and is sufficient for him to undertake its consideration. Under such a statutory pattern the absence of one or more of the informational requirements of the statement is not fatal to the validity of the subsequently issued permit.
The foregoing analysis also serves to distinguish this CAFRA case from South Brunswick Tp. v. N.J. Turnpike Auth., 129 N.J. Super. 126 (App. Div.), certif. den. 66 N.J. 334 (1974), in which this court invalidated authority to construct a Turnpike extension because of an inadequate environmental impact statement required by the controlling statute. N.J.S.A. 27:23-23.5. As in the federal legislation, the act governing the Turnpike Authority of New Jersey mandates that the Authority prepare an impact statement in accord with the detailed guidelines promulgated *220 by the Commissioner of Environmental Protection. Such guidelines are prepared for the Turnpike Authority and incorporated in the New Jersey Administrative Code, N.J.A.C. 7:1A-1.1 et seq.
This court, drawing on Calvert Cliffs', supra and other federal precedents, found that the statement prepared by the Authority was inadequate in several respects. And since such a complete statement was a necessary part of the decision-making process under the particular statute, the executive action in approving the route on the basis of a deficient impact statement was held to be invalid. South Brunswick Tp. v. N.J. Turnpike Auth., supra, 129 N.J. Super. at 135-136. The fact that under CAFRA the impact statement is prepared by the applicant and is subject to agency supplementation clearly distinguishes it from impact statements prepared by an agency under state or federal statutes which contemplate that the statements will evolve as an integral part of the agency's decision-making process.
In any event, even if the deficiency of an environmental impact statement under CAFRA could lead to the invalidation of the permit, the record negates the existence of the deficiencies asserted by appellants and amicus. In the context of the proceeding herein, where PSE&G adopted the NRC environmental statement as its own in its application, the analysis of the NRC staff demonstrates an adequate consideration of alternatives to the construction of the nuclear plant. In chapter 12 of that impact statement NRC discusses the following alternatives: purchased power, load shedding, reactivating or upgrading an older plant, baseload operation of a peaking facility and alternative fuels and sources of energy, such as coal, natural gas, municipal solid wastes, residual fuel oil, fossil fuel plant, gas turbines, hydroelectric power, geothermal energy, breeder reactors, solar power and wind power. Each alternative was evaluated as to technical and economic feasibility and environmental impact.
*221 The staff concluded that "the significantly lower generating costs and lower environmental impact of a nuclear plant, compared with a fossil plant, favor the selection of a nuclear plant. Further, since the sources of nuclear fuel are more reliable than those of fuel oil (which depends on foreign imports), more dependable electric service over the long term can be expected with nuclear plants."
The comprehensive evaluations contained in the federal environmental impact statement, emanating from an independent source rather than from the applicant itself, reflect a greater degree of impartiality and reliability. That statement was adequate for the federal agency to issue its construction permit. It was manifestly sufficient for the Commissioner to declare it complete under the requirements of CAFRA.
In addition to the alternative considerations in the impact statement, the opinion of the Atomic Safety and Licensing Board of NRC, which is part of the record, recites the efforts of the applicant to inspire conservation of electrical energy by its customers through various forms of advertising, termination of promotional advertising and an in-house conservation program. In fact, a survey of 1,000 of PSE&G's largest industrial and commercial customers indicates an anticipated 7% reduction in annual electricity consumption. Further efforts have been exerted in the area of revising peak load demands, which usually create a serious problem for electrical energy utilities.
As finally observed in the NRC Board's opinion:
Based upon the factors discussed herein concerning need for power and conservation of energy, the Staff concluded, and this Board so finds, that the Applicant will need the power to be generated by the Hope Creek facilities in 1981 and 1982 if a 20% reserve margin is to be retained.

* * *
The Board finds that construction and eventual operation of Hope Creek Generating Station, Units 1 and 2, are required for the Applicant to meet its forecast of electrical power demands and that the station, as designed and selected from feasible alternatives, represents *222 the optimum selection based on overall economic and environmental considerations.
The Public Advocate focuses his attack upon the absence of presentation of the alternative of energy conservation in the documentation accompanying the application, citing the statutory language, "Alternatives to all or any part of the project with reasons for their acceptability or nonacceptability." N.J.S.A. 13:19-7(g).
It must be borne in mind that CAFRA is not an act regulating nuclear facilities, as parallel legislation to the Atomic Energy Act. Its purpose and scope is to regulate land uses so as to preserve this "most ecologically sensitive and fragile area from inappropriate development and [provide] adequate environmental safeguards for the construction of any facilities in the coastal area." N.J.S.A. 13:19-2. See Toms River Affiliates v. Environm. Protection Dept., supra, 140 N.J. Super. at 146.
The Commissioner in his opinion has indicated that, in the contemplated overall plan for the Coastal Area, Artificial Island should ultimately be delineated as an appropriate locale for the development of electric power generation facilities based on all the statutory criteria.
In the context of the limited purpose of CAFRA the reference to alternatives to all or any part of the project would not appear to encompass the alternatives of techniques of fuel conservation or futuristic plans for power through solar energy, fossil fuels, coal, etc. Such considerations are relevant to the grant of a federal permit for construction of a nuclear energy plant, but have little or no relevancy to the delegated duty of the Commissioner to determine whether such a plant should be located at Artificial Island. Except for the mutual interest of the State in the safety factors relating to radioactive materials, the exploration of alternative methods of energy and energy conservation are of no moment in the resolution of the propriety of a CAFRA permit, albeit they may be significant in the consideration of a federal NRC permit.
*223 It would seem that the alternatives referred to in N.J.S.A. 13:19-7(g) would logically relate to other possible locations for all or part of the project, to differing designs of the physical structure or to methods necessary to lessen the degrading effect upon various aspects of the environment.[8] However, these would not reasonably include policy alternatives relating to the most feasible and preferable means of generating the electric power which is in such great demand in our present society. It is illogical to assume that the Legislature, by enacting CAFRA, intended to authorize a denial of a construction permit for an industrial use based on future hopes of other forms of energy.
For all of the foregoing reasons we find that the contentions referable to the deficiency of the Environmental Impact Statement and the alleged absence of consideration of other alternatives are without merit.[9]

V
It is manifest from our overview of the record that the Hope Creek project has been subjected to intensive study and analysis by many federal and state agencies, and particularly by NRC and the State Commissioner of Environmental Protection.
NRC, within its statutory function, has issued its construction permit on findings which conclude that the nuclear energy plant is necessary and feasible for the production of electric power needs of PSE&G in the State of New Jersey, and that the design of the plant and its equipment will not pose a threat to the environment or the health and safety of the public, if all the permit conditions are met.
*224 The Commissioner, in turn, has concluded that, from the viewpoint of the State of New Jersey and its inhabitants, the location of the generating plant on Artificial Island is compatible with the conditions in the particular locale and with the potential plan for development of the Coastal Area subject to his statutory jurisdiction. He has also determined generally that the construction and operation of the plant will not interfere in any substantial manner with the varied facets of the environment which may be affected provided the permit conditions are fulfilled; and his conclusions accord with the standards mandated by §§ 10 and 11 of the act. N.J.S.A. 13:19-10 and 11.
We observe that the objectors-appellants have not pointed to any evidence or data in the record which would demonstrate that the project may constitute a real threat to the life and health of the public or to the many-faceted components of the environment. Their attack is rather addressed to alleged deficiencies in the procedures leading to the grant of the permit and to those in the decision-making process. We recognize the right of interested persons and organizations to attack administrative decisions because of failure or refusal to comply with the legal safeguards applicable to administrative action. We do, however, highlight the absence of countervailing evidence and arguments dealing with the merits of the issue under consideration within the ambit of the purpose and intent of CAFRA.
CAFRA represents a legislative effort to balance the need for development of our economy and facilities for human needs with strict control of the degradation of our environment. See N.J.S.A. 13:19-2, "Legislative Findings." In administering the act the Commissioner is called upon to exercise a high degree of expertise and discretion in order to achieve the adjustment between the competing interests inherent in the purposes of the legislation. We are of the opinion that he did so in this case within the framework of the applicable law and the total record before him.
We therefore affirm.
*225 KOLE, J.A.D. (concurring).
I concur with Judge Larner's comprehensive opinion for the court, except that portion under part IV which construes the impact provisions of § 7 of CAFRA that calls for: "Alternatives to all or any part of the project with reasons for their acceptability or nonacceptability." N.J.S.A. 13:19-7(g). Since I do not consider the interpretation of the provision as essential to Judge Larner's determination of the merits in part IV of his opinion, I believe that a concurrence, rather than a dissent, is appropriate.
I do not agree with his conclusions that (1) the alternatives referred to in N.J.S.A. 13:19-7(g) relate solely to such matters as "other possible locations for all or part of the project, to differing designs of the physical structure or to methods necessary to lessen the degrading effect upon various aspects of the environment * * *; (2) that "these would not reasonably include policy alternatives relating to the most feasible and preferable means of generating the electric power which is in such great demand in our present society * * *," or (3) that it "is illogical to assume that the Legislature by enacting CAFRA intended to authorize a denial of a construction permit for an industrial use based on future hope of other forms of energy."
Where, as here, an electric power generation plant is sought to be built in the coastal area, in my view neither the language of N.J.S.A. 13:19-7(g) nor the legislative purpose of CAFRA requires a construction that precludes interested parties from requesting or the Commissioner from insisting that the environmental impact statement present data as to alternative energy sources, including such matters as conservation and cogeneration. Information of that nature in the statement, after hearing and investigation, may result in reliable data to support a conclusion that a proposed project or a part thereof actually may not be needed in the coastal area or otherwise may not satisfy the criteria of N.J.S.A. 13:19-10 for the grant of a permit in that area. Whether that *226 factor alone may suffice for denial of the permit need not now be decided.
The more expansive interpretation of this provision that I espouse is buttressed by the specific inclusion in CAFRA of electric power generation operations, including nuclear facilities, as a "facility" requiring a permit under that act, and the legislative concern that the Commissioner find that a nuclear electricity generating facility will have a method of disposal of radioactive waste that will be safe. See N.J.S.A. 13:19-3; 13:19-11.
As Judge Larner indicates in the balance of part IV of his opinion, there are other substantial reasons why the impact statement is sufficient, and even if it were deficient, it would not lead to an invalidation of the permit, since the record negates the existence of the deficiencies asserted by appellants and amicus. In addition to what Judge Larner has set forth in his opinion, I note that the Commissioner and the Board, by affirming the Commissioner's action, in fact did consider such factors as load management and conservation measures. Among other things, the Commissioner required, as a condition of the permit, that within six months of the effective date of the permit, "PSE&G will implement, with the approval of the PUC [Public Utilities Commission], a comprehensive load management program, the contents and procedures of which shall follow the guidelines and requirements of the SEO [State Energy Office] and PUC." He stated that it "is my intention that start of the construction of the Hope Creek facility should not be delayed or postponed on account of this requirement, but that PSE&G shall in a timely manner certify to full compliance with this condition."
Appellants have expressed concern that the situation facing the Commissioner after construction of the facility might in some fashion dilute his determination strictly to enforce the preoperational conditions imposed on the permit. In Power Reactor Development Co. v. Electrical Union, 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1964), the court dealt with a similar contention. The argument was there made that *227 the provisional construction permit authorized by the then Atomic Energy Commission would by its very nature lend itself to the Commission's refusal fully to review the matter again from the standpoint of safety when it issued the operating license. Justice Brenann for the court stated:
The respondents' argument is tantamount to an insistence that the Commission cannot be counted on, when the time comes to make a definitive safety finding, wholly to exclude the consideration that PRDC [the applicant] will have made an enormous investment. The petitioners concede that the Commission is absolutely denied any authority to consider this investment when acting upon an application for a license for operation. PRDC has been on notice long since that it proceeds with construction at its own risk, and that all its funds may go for naught. With its eyes open, PRDC has willingly accepted that risk, however great. No license to operate may be issued to PRDC until a full hazards report has been filed, until the AEC's Advisory Committee on Reactor Safeguards makes a full investigation and public report on safety to the Commission, until the Commission itself, after notice and hearings at which respondents, if they desire, may be heard, has made the safety-of-operation finding required * * * and until the other requirements of [the statute] have been met. It may be that an operating license will never be issued. If one is, that will not be the end of the matter. The respondents may have judicial review. * * * We hold that the actions of the Commission up to now have been within the Congressional authorization. We cannot assume that the Commission will exceed its powers, or that these safeguards to protect the public interest will not be fully effective. [367 U.S. at 414, 81 S.Ct. at 1538, 6 L.Ed.2d at 936].
Similarly here, we cannot assume that the Commissioner will not perform his statutory duties prior to permitting operation of PSE&G's facility, or, in the event he does not so perform, appropriate judicial relief will not be forthcoming.
NOTES
[1] PSE&G has a 90% interest and Atlantic City Electric Company a 10% interest in the project.
[2] See Toms River Affiliates v. Dept. of Environ. Protec., supra, for a summary of the pertinent provisions of the act, at 141-142.
[3] As part of the Energy Research and Development Act, 42 U.S.C.A. § 5801 et seq., the AEC was abolished in 1976 and its powers and duties transferred to the newly constituted Nuclear Regulatory Commission (NRC), 42 U.S.C.A. §§ 5814, 5841. The Commission, before and after the reorganization, will be referred to as NRC in this opinion.
[4] We have been advised that this determination is now on administrative appeal. Nevertheless, in view of the determination of the NRC Licensing Board on this issue, it requires no further discussion in this opinion.
[5] We do not pass upon the right of an applicant for a CAFRA permit to a trial-type hearing where appropriate objection has been made and a permit has been denied.
[6] See further amendment of regulations for Wetlands permit hearings adopted September 27, 1976 which states: "The Division may hold a public, nonadversarial, informational hearing for any wetlands permit application when, at its discretion, it feels the hearing is in the public interest." N.J.A.C. 7:7A-1.8(a).
[7] Note that 42 U.S.C.A. § 2021(b) permits state regulation of certain materials for the protection of the public health and safety from radiation hazards provided that an agreement has been entered into to that effect between the NRC and the Governor of the state. New Jersey is not a party to such an agreement.
[8] These alternatives are merely illustrative and are not intended to be all-encompassing.
[9] Appellants' "public trust" argument originally advanced in their brief has been abandoned.